GEORGE T. CRESS, Appellee, v. THEODORE IVENS and T. J. ANDRE, Appellants.

**Champertous agreements:** WHO MAY RAISE OBJECTION. A champertous agreement between the assignor and assignee of a contract can not be interposed as a defense to a suit on the contract itself by the assignee; as the other party to the contract assigned and sued on can have no interest in the alleged champertous agreement between the assignor and assignee.

**Contracts:** SUIT BY ASSIGNEE: DEFENSES. Where the consideration for the assignment of a contract is the agreement to pay the assignor a certain per cent realized upon the contract, the assignee becomes a trustee for the assignor and is authorized by statute to sue thereon; and every defense available against the assignor may be interposed to a suit by the assignee.

**Compromise and settlement:** FRAUD: RESCISSION: TENDER: EVIDENCE. Where fraud in the settlement of a controversy is claimed, rendering it voidable, it cannot be repudiated unless there has been a tender or offer to return the consideration received, except where the party rescinding is entitled in any event to retain the consideration; and failure to return or offer to return the consideration will constitute a ratification of the transaction. In this action, however, by the assignee of several different causes of action, claimed to have been settled in full by the several different assignors, the evidence is reviewed and held insufficient to show fraud in the settlement.

*Appeal from Woodbury District Court.*—HON. JOHN F.
OLIVER, Judge.

THURSDAY, FEBRUARY 12, 1914.

ACTION at law to recover the amount of certain commissions received by the defendants in alleged fraud of plaintiff's assignors. Certain affirmative defenses were pleaded by the defendants. Two of these are presented on this appeal. There was a judgment for the plaintiff for the full amount claimed. The defendants appeal.—*Reversed* and *Remanded.*

*Milchrist & Scott* and *Johnston Bros.*, for appellants.

*Pitkin & Smith* and *Chas. D. Goldsmith*, for appellee.

EVANS, J.—The plaintiff, as assignee of five assignors, brought this action upon the five separate causes of action of his assignors, respectively. The original transaction involved is the same as that involved in *Cress v. Ivens et al.*, 155 Iowa, 17. The claim on the part of the plaintiff is that the defendants, acting together, induced ten others to join them in the purchase of a large tract of land, consisting of 14,883 acres, in Minnesota, near the city of Duluth, at a stated price of $5.25 per acre. The proposed purchase was made. Each of such ten persons took a one-fifteenth interest in the enterprise. and the defendants the remaining five-fifteenths. The purchase was made from the Boston & Duluth Farm Land Company. The purchase was made by executory contract; one-sixth of the purchase price being paid down and the remainder to be paid in five equal annual installments. At the time of such purchase, each of the defendants had a contract with the seller for a commission of fifty cents an acre, making a total of $1 an acre for both commissions. This commission was also payable in installments out of the corresponding installments of the purchase price. It is contended for plain-

tiff that the defendants falsely represented to their ten associates that they were to receive no commission, and that their associates stood on an equality with them in the purchase.

The former action was brought by five of such associates. That suit was brought in equity and was in the nature of an accounting as for money received by the defendants from or on behalf of their joint associates; each associate claiming a one-fifteenth share thereof. The parties to that suit recovered the full amount claimed, and the judgment in their favor was affirmed here. In the present suit the rights of the remaining five associates are involved. The present action is brought on the law side but was tried to the court without a jury. The petition is indefinite in its allegations. It does not indicate whether it claims relief as for damages or as for money had and received. The distinction is perhaps not very material. And yet some stress is laid upon it in appellee's argument as bearing upon the question whether the causes of action now sued upon were covered or included by the settlements pleaded by the defendants and hereinafter referred to. Generally speaking, the theory of the plaintiff is that the false representations of the defendants caused each of their associates to pay more than they otherwise would have paid, and that the defendants received such excess in the form of commissions and are accountable therefor to their associates. There was no misrepresentation in any other sense as to the price of the land. The evidence is undisputed that the price quoted was the minimum price upon the tract. The evidence on behalf of the plaintiff shows that the selling company had a large acreage of land other than the land in question; that it classified its lands and fixed uniform prices upon lands of the same class; and that these were not and could not be deviated from without destroying the market for other unsold lands. The commission of $1 per acre was also the regular and usual commission paid. The alleged false representations, therefore, are confined to the question of commissions received, and the measure of recovery of each associate, if any,

is the excess amount paid by each associate by reason of the
inclusion of such commission in the purchase price. Such is
the theory on which the case was tried, and it bears upon the
nature and extent of the settlements hereinafter to be con-
sidered. Some of plaintiff's present assignors were named
as parties in the original suit. In pursuance of settlements
had by them with the defendants, they withdrew therefrom.
After the trial of the former suit, the plaintiff herein, who
was also a plaintiff in the former suit, obtained from his
assignors written assignments of their respective causes of
action arising out of the same transaction; these assignments
being obtained in the summer of 1910, shortly prior to the be-
ginning of this action on August 26, 1910.

· I. The interest of the plaintiff resting solely upon the
assignments referred to, the first affirmative defense urged by
the defendants is that each of the contracts, under which the
assignments were made, was tainted with
champerty and maintenance. It is claimed
under the evidence that the plaintiff, being a
layman and without any interest in the litigation, solicited
such assignments and agreed to run the risk and bear the ex-
pense of the litigation for a consideration of fifty per cent.
of the recovery. It is urged, therefore, that the assignments
should all be deemed null and void, and that the plaintiff's
petition should on that ground be dismissed. For the ap-
pellee, it is contended that the question of champerty, as be-
tween the plaintiff and his assignors, cannot be made an issue
in this case.

1. CHAMPERTOUS AGREEMENTS: who may raise objection.

The trial court did not pass upon the question of fact.
Because of our conclusions about to be expressed, we find it
unnecessary to pass upon it. There are some features of the
contracts in question that are not fragrant. For the purposes
of the argument, we may assume them to be champertous. It
is the contention of appellants that when the taint of cham-
perty is made to appear, and that plaintiff's title to the cause
of action rests thereon, it becomes the duty of the court to

refuse all relief and to dismiss the petition on that ground. There is some authority for this contention. *Miles v. Insurance Co.*, 108 Wis., 421 (84 N. W. 159). The weight of authority, however, is with the contrary view. In *Vimont v. Railway Co.*, 64 Iowa, 513, and s. c., 69 Iowa, 296, and in *Small v. Railway Co.*, 55 Iowa, 582, the contrary view was adopted by this court. Such contrary view is that a champertous contract between an assignee plaintiff and his assignor is not available to the defendant as a defense to the main action. To the same effect are *Foley v. Grand Rapids Railway Co.*, 157 Mich. 67 (121 N. W. 257); *Bick v. Overfelt*, 88 Mo. App. 139; *Prosky v. Clark*, 32 Nev. 441 (109 Pac. 793, 35 L. R. A. (N. S.) 512); *Woods v. Walsh*, 7 N. D. 376 (75 N. W. 767); *Taylor v. Gilman*, 58 N. H. 417; *Connecticut Fire Insurance Co. v. Way*, 62 N. H. 622; *Hart v. State*, 120 Ind. 83 (21 N. E. 654, 24 N. E. 151); *Davis v. Settle*, 43 W. Va. 17 (26 S. E. 557); *Elser v. Village of Grasspoint*, 223 Ill. 230 (79 N. E. 27, 114 Am. St. Rep. 326).

The following excerpts from some of the cited cases is a sufficient indication of their holding:

Even if the rule is still in force as to agreements with laymen, we think the better rule is that the contract is only void between the parties, and does not affect the obligation of the defendant to the plaintiff. (*Foley v. Grand Rapids & I. Ry. Co., supra.*)

The trial court evidently was of the opinion that the contract of assignment of the notes was champertous and for that reason could not be enforced by the assignee, who had the notes under the champertous agreement. Conceding that the contract of assignment was champertous, the respondent was not a party to that contract, and for that reason was in no position to avail himself of its illegality. . . . This is now the settled rule in Missouri and is supported by a decided weight of authority elsewhere. (*Bick v. Overfelt, supra.*)

In a suit by Prosky v. Hafer, to enforce the contract, the latter might set up the defense that the contract was void for champerty. Such however is not the case. There is no controversy between the plaintiffs, and whether the suit is con-

ducted in the name of Hafer alone or in his name and that of his grantee or assignee is of no consequence to this defendant. (*Prosky v. Clark, supra.*)

The contract by which the plaintiff acquired title to the note was in no way oppressive or injurious to the defendant, and there is no reason for his defeating the suit on a ground on which he could not defeat it, if it had been brought in the name of the payee without an indorsement of the note. (*Taylor v. Gilman, supra.*)

This is not a suit by Osgood against the company to recover compensation rendered under a champertous contract. The defendant cannot set up as a defense that the subject-matter of the suit has been made the subject of a champertous contract between the plaintiff and a stranger, unless he shows that the contract is in some way injurious to him. (*Connecticut River Mutual Fire Insurance Co. v. Way, supra.*)

There is a very practical reason why the rule contended for by appellants at this point should not obtain. The question whether champerty exists is usually a question of fact and may be made such in any case. It is not usually made to appear upon the face of an assignment. It does not so appear in the case at bar. If it were permissible, therefore, for the defendant in any case to raise the issue of champerty against an assignee plaintiff, it would necessarily be permissible for him to do so in every such case. He could thus deflect the course of a trial to settle an issue in which he had no real interest and which could not affect his ultimate liability. To open such a door would be to add greatly to the burden and confusion of litigation. It is more appropriate, therefore, that such issue should be raised and tried between the appropriate parties at a more appropriate time. Our statutes and our previous decisions are liberal in their recognition of the right of an assignee of a cause of action to sue thereon, regardless of the nature of the consideration paid and regardless of whether he hold the same as absolute owner or as agent or trustee for the owner. It is enough that he hold the uncontested legal title to the cause of action. *Knadler v.*

*Sharp,* 36 Iowa, 232; *Roberts v. Corbin,* 26 Iowa, 315; *Burrows v. Stryker,* 47 Iowa, 477; *Goodnow v. Litchfield,* 63 Iowa, 275; *Gere v. Council Bluffs Ins. Co.,* 67 Iowa, 272; *Vimont v. Railway Co., supra; Abell v. Hurd,* 85 Iowa, 559.

The consideration for the assignments involved in the case at bar was in each case a promise to account for the proceeds of the litigation and to pay assignors fifty per cent. thereof.

2. CONTRACTS: suit by assignee: defenses.

The legal effect of such an assignment upon such a consideration is to make the plaintiff a trustee for his assignor. As such he is entitled to maintain the suit under the provisions of Code, section 3459. It goes without saying that every defense available to the defendants as against the beneficiary is available to them, also as against the trustee plaintiff. They therefore suffer no prejudice by the assignment.

The assignments in this case have the merit that they enable five causes of action arising out of the same general transaction to be tried in one suit. This operates presumptively to the benefit of all the litigants. Similar motives frequently obtain in the assignment of causes of action, and they are not contrary to public policy.

II. As a separate affirmative defense to each cause of action set forth in the petition, the defendants pleaded a full settlement and discharge had in the year 1908 with each of

3. COMPROMISE AND SETTLE- MENT: fraud: rescission: tender: evidence.

plaintiff's assignors. By way of reply the plaintiff pleaded a general denial, and further that each of such settlements was procured through the fraud of the defendants, and that they were therefore void and now constitute no defense to plaintiff's causes of action. The real controversy, as presented to us, centers upon these settlements. Five assignors are involved: Rowe, Hammond, Collins, Patterson, and Larson. As to the first-named four of these, it is undisputed that settlements were had in August, 1908. Each settlement was made after the commencement of the previous suit heretofore referred to. The assignors were named as

parties to such suit, some as plaintiffs and some as defendants. The charge of fraud in the settlement is predicated upon the fact that the defendants either denied or failed to confess that they had received the commissions in question. There was no formal repudiation of the settlements either before or after the assignments to plaintiff. The fruits of the settlements have always been retained by the assignors, and no tender of return has ever been made by them or by the plaintiff. The settlement in each case was separate and independent from every other settlement. We shall therefore have to deal with them singly in considering the merits of the issue as to each one.

III. We turn our first attention to the cause of action of Mrs. Rowe and to the alleged settlement thereof. The following is her entire testimony: Emeline Rowe:

Acquainted with Dr. Andre and Ivens. Known them about twenty-seven years. I entered into the contract, jointly with other parties, known as No. 832. Dr. Andre approached me in relation to this purchase. He said he thought it would be a good investment. He said we was to pay $5.25 an acre. I took a one-fifteenth interest. I don't remember of anything being said by either Ivens or Andre about their receiving a commission. Q. If you had known that there was any such commission to have been paid them, would you have gone into the transaction? A. Yes, I think I would. Q. You would have bought the land just the same, you think? A. Yes, sir. It is my signature attached to Exhibit 3. [Exhibit 3 offered in evidence.] I think I signed Exhibit 3 on or about the date it bears. (Cross-examination:) I signed Exhibits C and D at or about the time that they purport to have been signed. Q. Now, Mrs. Rowe, before you signed these papers marked Exhibits C and D on August 25, 1908, you had signed a power of attorney to Mr. Cress relative to a suit brought against Dr. Andre and Theodore Ivens, is that correct? A. Well, it was for the . . . about the timber lands and to look after any fraud, as he told me, and that there was timber being taken off the lands, and it was to look after the interest of that. Q. Well, you had signed a paper at Mr. Cress' request? A. To that effect; yes, sir. Q. And the

paper, Exhibit D, addressed to George T. Cress and signed
by you August 25, 1908, was executed and delivered by you
for the purpose of revoking and canceling that arrangement,
was it? A. Yes, sir. I delivered these papers, Exhibits C and
D, to Dr. Andre. After I had executed and delivered these
papers, Exhibits C and D, August 25, 1908, to Dr. Andre, I
signed Exhibit 3, which was delivered to Mr. Cress. Q. Now,
I wish you would state, Mrs. Rowe, so that the reporter may
take it down, just why and under what circumstances you
signed this paper. A. Well, he was there two or three times,
and I refused. Q. That is, Mr. Cress came to you two or
three times and asked you to sign the paper? A. Yes, sir.
Q. Now, did you tell Mr. Cress why you didn't want to
sign another paper in connection with that matter? A. I
told him I wanted nothing more to do with it. Q. Did
you tell him that you had signed a paper of settlement
and given it to Dr. Andre? A. Yes, sir; I think I did.
Q. What did he say when he was informed that you had given
the settlement paper to Dr. Andre? A. He asked to see the
paper. Q. Did you show them to him? A. No, sir. It was
at the house, and I replied that the papers were at the bank.
Q. What did he say when he came the third time? When you
did sign the paper? What did he represent this paper was?
A. Well, he said it would obligate me in no way. Well, he
said it would be better for me if I signed that. It might cause
trouble if I didn't. Q. I wish you would make this matter
clear in the record, Mrs. Rowe, just how and in what way he
said this, that you had better sign the paper and it would
cause trouble if you didn't. What did you understand him to
mean? A. I couldn't say the exact words just what he said.
Q. Well, I am not asking you for his exact words, but what
did you understand his meaning was when he said you had
better sign it or it would cause trouble? What did you under-
stand him to mean? A. I don't hardly know. Q. Did you
understand that he was threatening to make you trouble if
you didn't sign it? A. Well, I supposed that was what—
Q. That was your understanding was it? A. Yes, sir. Q. Of
his meaning? A. Yes, sir. Q. Was that the reason that you
signed this last paper that you gave to Mr. Cress? A. It was.
Q. I ask you now, Mrs. Rowe, whether it is your present under-
standing that you have settled all your matters and had settled
all your matters and claims with Dr. Andre and Mr. Ivens at

the time of the execution of this paper, these papers, on May 25, 1909? A. Yes, sir; I understood that— Q. You understood that that was a complete settlement between you? A. Yes, sir. Q. Do you so understand that now? A. Yes, sir. Q. Is it your present desire that the settlement stand. A. Yes, sir. Q. You have no disposition now or desire to back out or set aside that settlement? A. No, sir. Q. And you understood at that time that this settlement included everything? A. Yes, sir. Q. That might be between you, including any claim that might grow out of these commissions? A. Yes, sir.

To the court's ruling striking the foregoing from the record, the defendants at the time duly excepted.

Redirect: After signing the paper which I gave to Mr. Cress, I have had very little conversation with either Dr. Andre, Mr. Ivens, or either of the Johnson brothers, or Mr. Scott, in relation to the transaction. The first conversation was in June, after having signed the paper. I remember of having a conversation with them concerning this paper. I told them I had signed the paper. I don't know that I told them what it contained. My talk was with Dr. Andre and A. C. Johnston. The conversation took place at my home in Schaller. They came to my home to interview me with relation to the paper I had given to Dr. Andre. They spoke about the paper I had given to Mr. Cress. They wanted to know if I understood what it was. I told them I felt like it had been misrepresented to me because I didn't think as I understood Mr. Cress; that it didn't relate to anything to the other one where I was released from all obligations; that after I had signed the paper I understood that it did. I understood so before they told me. I came to that conclusion by thinking and studying the matter over. I think the Cress contract relates to the same matter as the Andre contract. When I signed the paper for Mr. Cress, I had been told that Dr. Andre and Ivens had received a commission for the sale of the land, but I didn't believe they had when I signed the contract with Mr. Cress. I signed the paper because he said I had better. When I signed the paper for Dr. Andre, I understood that I was going to get out of being brought into court. At the time I signed the papers with Dr. Andre, he bought my other shares that I had, my shares in the land. At the time that I made the assignment to

Mr. Cress, he told me that I had my share of the commission coming that Dr. Andre and Ivens had received. I don't remember that I told him that if I had that I ought to have it. In my settlement with Andre he paid me for the shares; that is, for my interest that was left when the land was divided up. I still own some of the land. I couldn't tell you the amount. They paid me as much as $100. It was not before I had signed this paper for Mr. Cress.

It will be noted that a part of the foregoing testimony was stricken by the trial court. In view of the testimony of the defendants on the same subject, the ruling is not very material. It was doubtless stricken upon the theory that the present attitude of the witness was not binding upon the plaintiff. We may as well say at this point that as the beneficiary of the cause of action, and as the holder of the fruits of the settlement, her testimony at this point was clearly admissible and ought to have received the consideration of the trial court. Passing that question, however, this evidence shows no misrepresentation whatever on the part of the defendants in the original transaction. Nor does it show any in the settlement. It further appears from her testimony that the settlement was supported by a substantially full consideration in that defendants purchased from her all her interest in the Minnesota land. This settlement was satisfactory to her at the time and ever after down to the day of her testimony. She retained the fruits of the settlement and was not willing to relinquish them or to set the settlement aside. As already indicated, the plaintiff made no tender or offer of any kind to support his repudiation of the settlement. Plaintiff's pleadings and argument have proceeded upon the theory that if there was any fraudulent concealment on the part of the defendants at the time of the settlement, or failure to confess their receipt of the commissions, this of itself would render the settlement void *in toto,* regardless of any election to repudiate, and regardless of their return or offer to return the fruits of the settlement.

If there was fraud in the settlement, it was voidable, but voidable only. After the discovery of fraud, the election rested with plaintiff's assignor to repudiate. She was not bound to repudiate. She had an equal right to ratify. If she failed to repudiate with reasonable promptness, she would be deemed to ratify. Until she elected to repudiate, her right to the fruits of the settlement was absolute. She could not repudiate and yet retain the fruits of her settlement. The only exception to this rule is that where the party rescinding would be entitled to retain the money or property received, in any event, even though the contract be set aside. *O'Brien v. Railway Co.,* 89 Iowa, 644; *Howard v. McMillen,* 101 Iowa, 453; *Dillon v. Lee,* 110 Iowa, 156. This was not a case of that kind. By the settlement in this case, Mrs. Rowe sold her interest in the Minnesota land to the defendants and received her pay therefor. This was a part of the contract of settlement. She became entitled to receive and to hold the consideration for the land by virtue of such contract of settlement. After her discovery of the alleged fraud, she still preferred to hold the defendants to the contract of settlement rather than to repudiate the same and to claim for the amount of the commissions. In *Rose v. Eggers,* 148 Iowa, 311, we said:

But where the party undertaking to rescind has received money or property under the terms of the agreement sought to be avoided, to which he has no claim other than by virtue of the contract, the rule is of universal application that an offer to return, unless the necessity therefor has been obviated by conduct of the other party constituting a waiver, is essential as a condition precedent to the maintenance of an action at law for the recovery of property alleged to have been fraudulently procured. Bishop on Contract, section 679; Beach on Modern Law of Contracts, 792; *Perley v. Balch,* 23 Pick. (Mass.) 283 (34 Am. Dec. 56); *Sheldon Axle Co. v. Scofield,* 85 Mich. 177 (48 N. W. 511); *Masson v. Bovet,* 1 Denio (N. Y.) 69 (43 Am Dec. 651); *Balue v. Taylor,* 136 Ind. 368 (36 N. E. 269). Such a contract is voidable only. The injured party may confirm it and sue for damages if he chooses, or he

may disaffirm it, in which event fraud destroys the contract *ab initio,* and no reason can be assigned for permitting the party undertaking rescission to retain the property received and at the same time demand the return of that (the consideration) with which he had been wrongfully induced to part.

See, also, *Lake v. Dredge,* 158 Iowa, 725. We think it very clear that there can be no recovery in this branch of the case.

IV. We pass next to the claim of Hammond. Hammond testified in support of the claim. He testified that false representations were made to him in the original transaction, and perhaps inferentially at least that there was fraudulent concealment at the time of the settlement. The consideration of the settlement with him was that he exchanged his interest in the Minnesota land and certain mining stock with the defendants for an Iowa farm of 128 acres adjoining his own. The following excerpts from his testimony in rebuttal, in relation to the settlement, will be sufficient to indicate the general facts:

James Hammond:

I have heard the testimony relating to the settlement between myself, Andre, and Ivens for the commissions. The testimony in reference to the written instrument which I signed with Dr. Andre, I signed the contract, but I could not tell you who wrote the contract itself. This contract was read to me by Dr. Andre. I didn't know at this time about any commissions being received by Dr. Andre and Mr. Ivens. I don't remember that they said anything to me about it, I didn't think they had any commissions. Q. Then, of course, you didn't think you had any rights to any commissions? A. I didn't give any thought to it at all. I thought I was signing everything over, and it didn't make any difference to me. It didn't make any difference, and I didn't make any further inquiry. Q. Why didn't it make any further difference? A. Because I was not interested. Q. You didn't know there was any commissions to be interested in? A. I did not. Q. If you had known they had received $1,500 commissions belonging to you, would you have entered into the contract for settlement you did? A. I don't know about that. Q. Why

don't you know, Mr. Hammond? A. I never thought about it until now. In this settlement Dr. Andre traded me some land for my interests in the land in Minnesota. Dr. Andre gave me in exchange for my Minnesota land, my mining stock, and the settlement of my commission and all my claims, approximately 128 acres of land in Iowa. The Iowa land I took at $140 an acre. (Cross-examination:) At the time I settled with Dr. Andre and Mr. Ivens I didn't know that Cress and others were claiming that they had received a dollar an acre commission. They didn't tell me. At the time that I signed the contract of settlement between Andre, Ivens, and myself, I think that I knew there was a suit pending in Woodbury county over the commissions. I didn't know what it was for, whether a rebate on the lands or what, but I knew at this time that they were claiming that Ivens and Andre had gotten a rake-off on the land deal. Q. And that was the thing that you were trying to settle or did settle in this land trade between you and Dr. Andre? A. I did not know; it was to get rid of the land and the mining stock. Q. And this lawsuit that was there pending or threatened to be brought? A. I did not concern myself about that. Q. Andre, he was insisting as a part of this land trade that this other matter be settled? A. Perhaps he was. Q. Well, what is your best recollection? A. My best recollection was considering my own interest. I did not care what the outcome was, just so I got rid of the land and the mining stock. Q. And got a piece of land that joined yours? A. Yes, sir. Q. And was a desirable piece of land? A. Yes. Q. And you were familiar with it for the last thirty years? A. Yes, sir. Q. And desired that particular piece of land? A. It was not worth that until I had made a great deal of improvement on it. By the Court: When you signed that little instrument there, you supposed you were settling everything? A. Yes, sir; I did. By the Court: And there wasn't anything you cared about; if there were any commissions you were settling it? A. No, that is right. By the Court: You did not calculate to have any claim or make any further investigations? Q. You are willing to release all claims in order to get this settled up and get this piece of land? A. Yes, sir; I was. Q. Was it your intention to do that? A. Yes, sir; it was.

(Redirect:) Q. How could it have been your intention to do that if you did not know you had any commissions?

A. Well, I didn't know there was anything coming to me in that way.  Q. That is the reason you say you did not concern yourself about it?  A. Yes, sir.  Q. The reason you did not take into consideration any commissions was because you did not know you had any?  A. I did not know there was any coming.  By the Court: If there had been it would have been the same thing, wouldn't it?  A. Well, we might have made some other arrangements, I don't know.  By the Court: But there was something said about commissions; what commissions did you suppose you were releasing?  A. I never gave any thought to it, I hardly—just passed along and signed these instruments.  Q. Did you know that the word 'commission' was used in there?  A. I had no recollection of it until I saw it here.  By Mr. Johnston: It was read to you, Mr. Hammond.  A. It was.  Q. At the time you signed it you knew what was in the instrument?  A. I don't remember.  Q. But at the time you signed it it had been read to you?  A. Yes, sir.  Q. And you did not sign it without first knowing what it contained?  A. I had it read to me.  I did not charge my memory with it at all.

Much of what we have said in the preceding paragraph is applicable here.  It is difficult to find in the foregoing testimony any support for a claim of fraudulent representations in the settlement.  Be that as it may, it is very clear therefrom that the witness has at all times ratified the settlement, and that he has never been willing to repudiate it at the expense of yielding its fruits.  Not only has he and his assignee failed to tender a return of such fruits, but it is manifest from his testimony that he would not consent to return them under any circumstances.  Under the settlement he has received the Iowa farm, and he proposes to keep it as he is entitled to do; but he cannot keep it and at the same time repudiate the contract of settlement under which he received it.

V. Passing to the Collins claim, Collins also testified for the plaintiff.  He testified to false representations in the original transaction.  He also testified that at the time he signed the settlement he did not know there was any com-

mission. He did know, however, of the pending suit. In
pursuance of the settlement with him, the defendants pur-
chased from him his entire interest in the Minnesota land
and paid him therefor. While the details of the story vary
as compared with those we have set forth in the preceding
paragraphs, they agree in all material respects. The net re-
sult is the same. Collins received full consideration for all
his interest in the enterprise as a result of the settlement and
has held the fruits to the day of trial without tendering any
return or manifesting any desire to do so.

VI. Passing to the claim of Patterson, he also was a
witness. There is no substantial dispute as to the considera-
tion for the settlement received by him. The settlement with
him was more favorable than any of the other assignors un-
less it be Hammond. The defendants purchased his interest
also in the Minnesota land and agreed further that, if the
plaintiff recovered judgment in the then pending suit, Pat-
terson should receive from the defendants fifty per cent. of
the amount which he would have received if he had continued
party plaintiff in such suit. There was therefore no fraud
in the settlement, so far as Patterson was concerned. This
part of his settlement was made contingent upon the outcome
of the then pending suit. If he is entitled to recover, not-
withstanding the settlement, it can only be on the ground that
there was no consideration for a promise to accept fifty per
cent. of a liquidated claim in lieu of the whole. In this case,
however, there was other consideration than the mere prom-
ise to pay fifty per cent. in the fact already stated that the
defendants purchased his interest in the enterprise. Like
the cases already considered, there was no repudiation by
Patterson nor any offer or tender to return such benefits as he
had received.

VII. As to the case of Larson, the facts are quite dif-
ferent in their details from those of the other cases. By the
testimony of the defendants, Larson went into the enterprise
under a conditional arrangement with them that, if at any

time he became dissatisfied, they would take the venture off
of his hands; that at the expiration of one or two years Larson did elect to require them to take the enterprise and refund his money; that they complied fully with his request and refunded to him the amount of the one or two installments which he had paid, with 8 per cent. interest thereon, and assumed all future installments. The only difference between the testimony of the defendants and that of Larson in this respect is indicated by the following excerpts from his testimony:

I bought a one-fifteenth part of the tract of land. I afterwards sold it back to Andre and Ivens. I couldn't say, but I think probably a year or two later. I don't think that my resale to Andre and Ivens was according to some arrangement which I had made with them at the time that I went into the deal. I don't remember at present what was said about me not having money to handle this land at the time that I purchased it. I don't remember the details. I don't think or remember that anything was said at that time about them taking the lands off my hands. There was no arrangements made at that time.

Larson conceded as a witness that he had received back the full amount paid, with eight per cent. interest, and that he was released from further performance of the contract. This arrangement, however, was consummated long before there was any question raised as to the commissions. The arrangement, therefore, was not a settlement of any pending suit or any claim for fraud. The real question presented here is whether he ever suffered any damage by the alleged fraud of the defendants. The theory of liability put forward by the plaintiff is that the commissions received by the defendants came out of the pockets of their associates. These commissions were paid in installments corresponding to the installments of the purchase money. Larson paid only two or possibly three of such installments. The defendants themselves took care of the rest. Under no circumstances,

therefore, could Larson be entitled to receive more than the amounts included in the installments actually paid. But even these were all returned to him, with eight per cent. interest, and confessedly at his request. If this was done in pursuance of a conditional arrangement entered into in advance between Larson and the defendants, then we think no cause of action remained to him as for money fraudulently had and received. He had stipulated his remedy in advance, and it was equitable. At his request, the agreed remedy had been fully performed by defendants. If the release of Larson was performed without any previous arrangement on the subject, it would present a somewhat different question. We do not think, however, that this record would fairly justify any other finding of fact at this point than that the purchase of Larson's interest by the defendants was in pursuance of an original understanding to that effect.

It is our conclusion upon this record that the settlements shown therein have been fully ratified and never repudiated in a legal sense. Nor is there anything in this record indicating that the considerations received and agreed to be received by the plaintiff's assignors in pursuance of such settlements were not a full and fair restitution for the wrong done.

Finally we feel constrained to say that the prosecution of this suit by the plaintiff, as assignee, illustrates the evil of champerty and maintenance. Plaintiff obtained these assignments from unwilling assignors. It is manifest that not one of them would ever voluntarily have prosecuted his own action. We have above set out the testimony of Mrs. Rowe and Hammond. Even Collins testified: ''I told him I didn't know if he could get anything out of it or not, and if he wanted to try to go ahead. . . . As near as I can remember, I told him I didn't think he could get anything out of it.''

Patterson testified that plaintiff ''had approached me with reference to signing Exhibit 4 a few times, a couple of times before this. . . . Yes, that he was going to prose-

cute the case and collect what he could.  Q. And that you would be at no expense in connection with it?  A. That was the understanding as the contract shows there.''

Larson testified as follows:

I understood that he had taken the other parties for what he could get out of it, and I told him I was willing to give half if I could get anything out of it, and he could get the other · half the same as the other contracts you have right here.  Mr. Cress had told me about the other contracts.  I couldn't swear who first spoke about it.  I knew that Cress was working this case up.  He had told me so himself.  Cress was the first one to talk to me about it.  He told me he was trying to recover this here commission, and that he would have the cases up for one-half and no expense to me whatever.  He was to pay all the expenses.  I think this was also talked in Judge Goldsmith's office.  It was also talked when we signed the agreement, but the talk and understanding with Cress, at these various times when he was trying to get me to make this assignment, was that it was to be without expense to me, and that he (Cress) was to bear the expenses, and he was to bring the suit in his own name and pay his own expenses, pay the lawyers and all the expenses, and I was to be to no expense, and he was to repay to me one-half of what he got.

For the reasons indicated in the discussion, the case must be reversed on all counts, and it is so ordered.—*Reversed.*

LADD, C. J., and WEAVER, and PRESTON, JJ., concur.