**HEALTH CARE EQUALIZATION COMMITTEE OF the IOWA CHIROPRACTIC SOCIETY, Plaintiff,**

v.

**IOWA MEDICAL SOCIETY et al., Defendants.**

**Civ. No. 79–381–A.**

United States District Court, S. D. Iowa, C. D.

Nov. 5, 1980.

Lex Hawkins, George F. Davison, Jr., Glenn L. Norris, Donald J. Polden, Hawkins & Norris, Des Moines, Iowa, for plaintiff.

H. Richard Smith, Des Moines, Iowa, Dennis C. Waldon, Roan & Grossman, and Jay H. Hedgepeth, Chicago, Ill., for defendant American Hosp. Assn.

A. Roger Witke, John C. Eddy, Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, Iowa, for Blue Cross of Iowa.

Kenneth W. Biermacher, Des Moines, Iowa, James L. Simon, Chicago, Ill., for defendants.

Robert B. Throckmorton, Arthur F. Owens, Des Moines, Iowa, for defendants Iowa Medical Society, Donald C. Young, M. D., and Nelson H. Chesney, M. D.

L. Call Dickinson, Jr., Craig F. Graziano, Des Moines, Iowa, for defendant Blue Cross & Blue Shield of Iowa.

Thomas J. Miller, Atty. Gen., Jeanine Freeman, Gary H. Swanson, Asst. Attys. Gen., Des Moines, Iowa, for defendant Norman L. Pawlewski.

Dennis D. Jerde, Robert F. Holz, Jr., Des Moines, Iowa, and Newton N. Minow, Jack R. Bierig, Sidley & Austin, and Bernard D. Hirsh, B. J. Anderson, Chicago, Ill., for American Medical Association, Clarence R. Denser, Jr., H. Doyl Taylor, Am. Hospital Assn., Joint Commission on Accreditation of Hospitals, and American College of Radiology.

B. A. Webster, Brent B. Green, Arthur E. Gamble, Richard W. Berglund, Des Moines, Iowa, for defendant Iowa Hospital Association.

John D. McClintock, Hansen, McClintock & Riley, Des Moines, Iowa and James A. Cherney, John R. McCambridge, Paul M. VanArsdell, Jr., Hedlund, Hunter & Lynch, Chicago, Ill., for American College of Radiology.

## RULING AND ORDER

STUART, Chief Judge.

The Health Care Equalization Committee ("HCEC"), standing as a committee of the Iowa Chiropractic Society, Inc. and purporting to be assignee of the claims of over 150 Iowa chiropractors, initiated this action against fourteen defendants, including six professional and trade associations, Blue Cross and Blue Shield, the Iowa Commissioner of Health, and other individually named physicians. HCEC alleges that these defendants have interfered with the practice of Iowa chiropractors in violation of §§ 1 and 2 of the Sherman Act, the state common law of tort, and federal civil rights statute, 42 U.S.C. § 1983. Defendants have filed motions seeking dismissal of this action based on lack of capacity and standing to sue, lack of personal jurisdiction and venue, and failure to state a claim upon which relief can be granted.

## I. CAPACITY AND STANDING

All defendants have either filed or joined in the filing of a Motion to Dismiss for Lack of Capacity and Standing to Sue.

### A. Capacity

"Generally, capacity is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate and typically is determined without regard to the particular claim or defense asserted." Wright & Miller, 6 Federal Practice and Procedure § 1559 at 727–28 (1971).

Rule 17(b) of the Federal Rules of Civil Procedure governs capacity to sue and provides in part:

[C]apacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States. . . .

This rule requires the court to look first to the state law to determine if an entity has the capacity to sue. It will do so assuming for this purpose that plaintiff's allegations concerning HCEC are true and that it is a committee of the Iowa Chiropractic

Society authorized by the society to investigate and prosecute this action. It is governed by ten doctors of chiropractic licensed in Iowa. More than 150 Iowa chiropractors have, in writing, assigned their individual causes of action against these defendants to HCEC, giving it power of attorney in fact and creating an express trust over the funds contributed by them. It authorizes the committee to prosecute the instant action and collect the benefits on behalf of HCEC and its assigning members.

### 1. Capacity under Chapter 504A, Code of Iowa

■ Plaintiff asserts that HCEC has been delegated the management power to pursue this suit by the Iowa Chiropractic Society, Inc., an Iowa non–profit corporation under Chapter 504A. The Iowa law does not allow a subordinate committee to sue in its own name. Under Iowa Code § 504A.21, a non–profit corporation can delegate to an executive committee the authority of the board of directors except that authority specifically exempted from such a delegation in the statute. Obviously, however, the board cannot delegate authority it does not have in the first place. A board of directors does not have the authority to sue in its own name as a board on behalf of the corporation; instead, legal action must be taken in the name of the corporation itself. Iowa Code § 504A.4(2) (Supp.1979). Therefore, even if HCEC was properly formed under § 504A.21, Chapter 504A would not vest in it the authority to assert the present claims.

### 2. Capacity under Iowa Common Law

■ The Court believes that HCEC is an unincorporated association with the capacity to sue under Iowa law. In *Wilson & Co. v. United Packinghouse Workers of America*, 181 F.Supp. 809, 815 (N.D.Iowa 1960), Judge Graven in ascertaining the status of the local union defendant under Iowa law cited the United States Supreme Court's definition of "association" in *Hecht v. Malley*, 265 U.S. 144, 157, 44 S.Ct. 462, 467, 68 L.Ed. 949 (1924):

It has been defined as a term 'used throughout the United States to signify a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise.'

Judge Graven concluded that the local union was in fact an unincorporated association. *Wilson*, 181 F.Supp. at 815.

Although the committee concept advanced here is not the type of organization ordinarily considered an association, this Court is persuaded that HCEC comes within this broad definition. It was formed for the purpose of furthering a common goal-prosecution of this action. Even though there is no corporate charter, the committee is given the power to make by–laws, to compensate members, and to conduct activities in furtherance of the association's purpose. HCEC adopted the society's by–laws and constitution.

Under the law of Iowa, unincorporated associations are given the capacity to sue and be sued as a legal entity. See Wright & Miller, 6 Federal Practice and Procedure, § 1564 at 742 (1971). HCEC, as an unincorporated association with capacity to sue under Iowa law, has capacity to sue pursuant to Federal Rule of Civil Procedure 17(b).

### 3. Capacity under Federal Substantive Law

■ Even if the Iowa common law did not give an association the capacity to sue, HCEC would have the right to bring this action as a separate entity under the federal substantive right exception found in Rule 17(b)(1), which provides that an unincorporated association not accorded legal status under state law may still have capacity to sue if it is suing for "the purpose of enforcing ... a substantive right existing under the Constitution or laws of the United States, ...".

■ The Federal and Iowa definitions of unincorporated association are the same: a group of persons formed voluntarily without a charter for the purpose of promoting a common enterprise or objective. *Hecht v.*

*Malley*, 265 U.S. 144, 157, 44 S.Ct. 462, 467, 68 L.Ed. 949 (1924); *Associated Students of University of California at Riverside v. Kleindienst*, 60 F.R.D. 65, 67 (C.D.Cal.1973); *Local 4076, United Steelworkers v. United Steelworkers*, 327 F.Supp. 1400, 1402–03 (W.D.Pa.1971); *Yonce v. Miners Memorial Hospital Association*, 161 F.Supp. 178, 186 (W.D.Va.1958). The Court earlier concluded that HCEC is an unincorporated association under this definition.[1]

Further, the plaintiff's complaint clearly alleges a claim seeking to enforce a substantive right pursuant to federal antitrust law under claims assigned to it. Pursuant to the Court's responsibility to determine the applicability of the substantive federal right exemption found in Rule 17(b)(1),[2] the Court concludes that HCEC has capacity to sue as an unincorporated association in its own name under Federal Rule of Civil Procedure 17(b)(1).

Therefore, all defendants' requests for dismissal for lack of capacity to sue are denied.

### B. *Standing*

#### 1. *Treble Damage Claim*

The Eighth Circuit Court of Appeals recently affirmed the dismissal of a complaint on the ground that plaintiff, a non-profit association, lacked standing to assert the federal antitrust claims in either its own right or in its representational capacity. *Associated General Contractors v. Otter Tail Power*, 611 F.2d 684, 687–691 (8th Cir. 1979). In arguing that HCEC lacks standing to assert the damage claims, the defendants rely heavily on the Eighth Circuit's observation that associational standing is traditionally denied for treble damage claims asserted pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15. *Id.* at 689.

The Court agrees that under Associated General Contractors, HCEC could not assert the treble damage claims of its members if it based its power to do so on the doctrine of associational standing alone. HCEC, however, is assignee of the claims of 150 chiropractors in the State of Iowa. The Eighth Circuit has recognized that an association can have standing to assert antitrust damage claims validly assigned to it by members. *Louisiana Farmers' Protective Union v. Great A & P Tea Co.*, 131 F.2d 419, 423 (8th Cir. 1942). See also *Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975). Standing cannot exist, however, if the assignments of the claims are invalid. *Louisiana Farmers' Protective Union*, 131 F.2d at 424.

Defendants claim that the assignments to HCEC are invalid because federal antitrust treble damage claims are not assignable, citing *Pardoe v. Iowa State National Bank*, 106 Iowa 345, 76 N.W. 800, 802 (1898), which held that § 5197 of the Revised Statutes of the United States authorizing persons who paid usurious interest to a national bank, or his legal representative, to recover twice the usurious amount did not give the debtor the right to transfer the claim to an assignee. The Iowa Supreme Court reached this conclusion upon a review of the statutory language and the policy to make personal to the debtor the right to take advantage of usury. *Id.* The Court does not believe that Pardoe mandates a finding that federal antitrust claims for treble damage cannot be assigned. The case was decided over eighty years ago interpreting a different statutory provision which was construed at that time in light of a policy strongly favoring the debtor's personal pursuit of a claim based upon usury. The Court is confident that at this time treble damage claims are assignable. See *Hicks v. Bekins Moving & Storage Co.*, 87 F.2d 583, 585 (9th Cir. 1937); *Mercu–Ray Industries, Inc. v. Bristol–Myers Company*, 392 F.Supp. 16, 18 (S.D.N.Y.), aff'd sub nom. 508 F.2d 837 (2d Cir. 1974); *Isidor Weinstein Investment Co. v. Hearst Corporation*, 303 F.Supp. 646, 649 (N.D.Cal.1969); *Gerr v. Schering Corporation*, 256 F.Supp. 572, 574 (S.D.N.Y.1966); *Northern California Monument Dealers Association v. Inter-*

---

1. See p. 976 of this Order.

2. See *National Association for Community Development v. Hodgson*, 356 F.Supp. 1399, 1402 (D.D.C.1973).

*ment Association of California,* 120 F.Supp. 93, 94 (D.Cal.1954).

■ The defendants next challenge plaintiff's standing to assert the treble damage claims on the ground that the assignment is invalid because (1) no consideration was given for the assignments, and (2) the assigning chiropractors did not assign their interest in the claims. The Court rejects these claims. In the Agreement, Assignment and Power of Attorney attached as Exhibit A to plaintiff's resistance to defendants' motions, the following paragraph is found:

> In consideration for this agreement, I shall receive a pro rata or proportionate share of any monies, or things of value which may be recovered or received by the named plaintiffs for the benefit of the limited class as a result of any settlement, trial, or otherwise arising out of the cause of action against the prospective defendants.

The Court interprets "pro–rata or proportionate share" to mean per capita for each assigning member and not in relation to the amount of damages each individual might be able to prove. In *Cress v. Ivens,* 163 Iowa 659, 145 N.W. 325, 327 (1914), the Iowa Supreme Court held that a promise by an association to account for proceeds of litigation and to pay 50% thereof to assignors was adequate consideration for the assignment. In this assignment, each assignor has exchanged the right to attempt to prove and recover his individual damages for a per capita share of the amount received, if any. This Court, therefore, believes that the assignment in question was supported by adequate consideration.

The assignor chiropractors made a complete or full assignment of their claims to HCEC. The agreement states:

> I hereby assign any and all rights, existing or prospective in my cause or causes of action arising under the antitrust laws or other laws, against the prospective defendants to the Health Care Equalization Committee of the Iowa Chiropractic Society, and further agree to become an assigning member of said committee.

There is no reservation of rights clause contained in the agreement. All assignors are bound by the majority vote of the assigning members on the settlement question. The fact that "ten doctors of chiropractic" serve as governing committee does not mean that the assignors have retained control. In fact, the agreement explicitly vests control powers in the committee.[3]

■ The defendants finally argue that the assignments constitute a sham transaction designed to circumvent the holding of Associated General Contractors and the policy set forth in 28 U.S.C. § 1359. Section 1359 provides: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." The assignments in this case, however, were not necessary for this Court to have jurisdiction of the claims alleged against defendants. The assignor chiropractors could have sued separately, joined together in a suit, or attempted to proceed pursuant to Federal Rule of Civil Procedure 23 as a class. Therefore, the assignments herein could not have been made "improperly or collusively" to invoke federal jurisdiction; jurisdiction was available otherwise. In addition, the Court finds no merit in defendants' position that plaintiff's argument, should it prevail, will somehow undermine the Eighth Circuit's decision in As-

---

3. The agreement states:

> The Health Care Equalization Committee shall have the power to make all reasonable by–laws for its operation, the power to compensate Committee members for reasonable expenses incurred with respect to their official activities, subject to the approval of the governing board of the Iowa Chiropractic Society, and the Committee shall have the power to generally manage the litigation, including the power to settle the litigation, on reasonable terms against any party. Any final settlement must be ratified by a majority vote of the assigning membership of the Committee.

The fact that ratification by a majority vote of the membership is required of final settlement in no way alters the Court's opinion.

sociated General Contractors. The plaintiff and assignors chose a method recognized by the Eighth Circuit for the presentation of their treble damage claims against defendants. *Louisiana Farmers Protective Union*, 131 F.2d at 423. As a result, the Court hereby finds that HCEC has standing to assert the treble damage claims contained in the complaint.

In *Louisiana Farmer's Protective Union*, 131 F.2d at 423–425, the Court required plaintiff to amend the complaint to assert the individual damage claims of each assignor. In this case, plaintiff will be called upon to prove damages in the same manner. However, there will be no need for separate verdicts because of the terms of the assignment. The Court believes that this is a proper matter for discovery and need not be specifically pleaded.

### 2. *Equitable Relief Claim*

■■■■ The Court must now face the defendants' challenge to HCEC's standing to seek the equitable relief it requests in the complaint on the ground that the requirements for associational standing cannot be met.

As the defendants point out, the Eighth Circuit in *Associated General Contractors*, 611 F.2d at 690, held that an association can have standing to seek equitable relief on behalf of members under § 16 of the Clayton Act, 15 U.S.C. § 26, if the requirements of *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) are satisfied. In *Hunt*, the Supreme Court reiterated the three-pronged test for associational standing found in *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975):

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are ger-

mane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441. The defendants make no claim that the first two prongs of this test cannot be met, and the Court finds that they are in fact satisfied. The defendants do, however, argue that HCEC fails to meet the final requirement because the claims being asserted will require the participation of individual members of HCEC. The Court disagrees.

HCEC requests in its complaint that defendants be permanently enjoined and restrained from continuing the unlawful practices alleged. Contrary to defendants' contentions, the Court does not believe that such a request will require individualized proof, and believes that the allegations of injury to its members are sufficient for purposes of standing. In addition, the Supreme Court in *Warth v. Seldin*, 422 U.S. at 515, 95 S.Ct. at 2213, stated:

[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

This Court has concluded above that HCEC has standing to assert the treble damage claims of its assigning members, and it is appropriate that the committee also be allowed to seek equitable relief on their behalf.[4] Therefore, the Court hereby finds

---

4. Generally, a party who has standing under 15 U.S.C. § 15 to sue for treble damages will have standing to seek injunctive relief under 15 U.S.C. § 26. See *Bogus v. American Speech & Hearing Ass'n*, 582 F.2d 277, 289 (3rd Cir. 1978); *Yoder Bros. Inc. v. California–Florida Plant Corp.*, 537 F.2d 1347, 1361 n. 8 (5th Cir.), cert. denied, 429 U.S. 1094, 97 S.Ct. 1108, 51

L.Ed.2d 540 (1976); *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1174 (5th Cir.), rehearing denied en banc, *Saranthus v. Tugboat, Inc.*, 540 F.2d 1085 (5th Cir. 1976).

In addition, the Eighth Circuit in *Associated General Contractors*, 611 F.2d at 690 n. 6 recognized that standing to assert a claim of equitable relief by an association on behalf of its

that HCEC does have standing to seek equitable relief on behalf of its members.

## II. JURISDICTION AND VENUE

Defendants AMA and Dr. Sabatier filed a Motion to Dismiss for lack of jurisdiction and improper venue on February 19, 1980. Defendant American College of Radiology ("ACR") filed a motion seeking dismissal on the same grounds on March 3, 1980.

### A. Section 12 of the Clayton Act

■ Section 12 of the Clayton Act, 15 U.S.C. § 22, which governs personal jurisdiction as well as venue in actions initiated under the federal antitrust statutes against corporations, provides:

> Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

This provision authorizes the obtaining of personal jurisdiction by service of process in the district in which the corporate defendant is incorporated (*U. S. v. Scophony Corporation*, 333 U.S. 795, 809, 68 S.Ct. 855, 862, 92 L.Ed. 1091 (1948)) or is "present . . . by its officers and agents carrying on the business of the corporation" (*Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 371, 47 S.Ct. 400, 402, 71 L.Ed. 684 (1927)), if such corporation is subject to venue in the forum district. The only issue the Court need consider here is whether AMA or ACR "transacts business" in this district· so as to meet the venue requirement.[5] If venue is not proper here, plaintiff could not get personal jurisdiction of the moving corporate defendants by extra-territorial service. If venue is proper in this district, this Court has personal jurisdiction over such defendants.

members could be found even if the association could not assert treble damage claims under 15 U.S.C. § 15 and thereby accepted the notion that there is a lower threshold requirement for standing to assert claims under 15 U.S.C. § 26.

■ A corporation "transacts business" in a district for purposes of § 12 only if in the "ordinary and usual sense" it transacts business of "substantial character". *Eastman Kodak Company*, 273 U.S. at 373, 47 S.Ct. at 403; *Scophony Corp.*, 333 U.S. at 807, 68 S.Ct. at 861; *Athletes Foot of Delaware, Inc. v. Ralph Libonati Co., Inc.*, 445 F.Supp. 35, 43 (D.Del.1977); *Friends of Animals, Inc. v. American Veterinary Medical Association*, 310 F.Supp. 620, 622 (D.C.N.Y. 1970); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 291 F.Supp. 252, 256 (E.D.Pa.1968). This "transacts business" standard was intended by Congress to be broader than the "may be found" standard, *Eastman Kodak Company*, 273 U.S. at 372–73, 47 S.Ct. at 403, but "certainly more than a few isolated and peripheral contacts with the particular judicial district . . ." must be evident to constitute business of a substantial character. *Stern Fish Co. v. Century Seafoods, Inc.*, 254 F.Supp. 151, 153 (E.D.Pa.1966). See also *Athletes Foot of Delaware*, 445 F.Supp. at 44; *Bogus v. American Speech and Hearing Association*, 389 F.Supp. 327, 330 (E.D.Pa.1975) rev'd and aff'd on other grounds, 582 F.2d 277 (3rd Cir. 1978). The determination of whether a corporation "transacts business" for purposes of § 12 can only be made by evaluating the contacts it has with the district.

### 1. ACR

■ According to the affidavit of its executive director, ACR has no office in Iowa, is not licensed to do business in Iowa, has no agent or property in Iowa, makes no purchases in Iowa, and has held no seminars, workshops or other meetings in Iowa. The governing body of the organization, the Board of Chancellors, has never met in

5. Neither AMA nor ACR are inhabitants of the State of Iowa, nor is there any evidence that they are found in this state through the presence of officers and agents carrying on corporate business. In addition, AMA or ACR do not claim that process was not served in a proper district.

Iowa and no employees of ACR reside in Iowa. Even though the plaintiff alleges in its resistance that ACR is involved in an ongoing process of certifying radiologists and hospitals, it offers no supporting evidence. The Court finds on the basis of Stronach's supplemental affidavit attached to ACR's reply memorandum that ACR is not involved in the licensing, certifying or accreditation of hospitals or radiologists. ACR has less than 1% of its membership residing in Iowa. It makes membership mailings but does not "solicit, advertise, promote, or otherwise conduct any of its activities in Iowa", although some of its mailings go to persons who are not members.

Upon a review of ACR's contacts with Iowa, and pertinent case law, the Court must conclude that ACR does not "transact business" in the State of Iowa within the meaning of § 12 of the Clayton Act.

In *Bartholomew v. Virginia Chiropractors Association*, 612 F.2d 812 (4th Cir. 1979), cert. den. 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980), five chiropractors challenged the peer review procedure utilized by health insurance carriers in cooperation with the State Chiropractic Association under §§ 1 and 2 of the Sherman Act. The American Chiropractic Association ("ACA") was a named defendant, and the district court denied its motion to dismiss for lack of venue. On appeal, the Fourth Circuit reversed that decision and held that ACA was not transacting business in the state within the meaning of § 12 of the Clayton Act. *Id.* at 816. The court described ACA's contacts with Virginia as follows:

> Virginia accounted for only 53 of the 8875 national members, .06 per cent of its membership. ACA never qualified to do business in Virginia ... and its sole office was in Iowa. In Virginia, there were no offices, no officers, no agents, no property, no purchases, no seminars or workshops, and no sales, save of pamphlets, journals, and other educational and public relations materials generating very little revenue. All transactions were by mail. No membership meetings were convened

in Virginia; no directors or employees resided there.

*Id.* On the basis of these contacts, the court concluded:

> ACA's solicitation of advertising time and its dissemination across Virginia borders of correspondence, informational materials, public service educational programs, by mail, radio, television and newspaper (free of cost to ACA) was not transacting business in the State within the meaning of Section 12 of the Clayton Act, 15 U.S.C. § 22.... Otherwise, every State in the Union into which such programs were aimed or thrust by media or mail would provide an acceptable forum for suit based on 'transact[ing] business' therein.

*Id.*

In *Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 428 (5th Cir. 1977), the circuit court held that the Professional Golfers' Association of America's ("PGA") contacts with the district were too tenuous to subject it to suit under § 12 of the Clayton Act. Fifty–five PGA members resided in the district, a golf magazine containing ads of the PGA was circulated in the district, PGA applications were available there, the PGA conducted a five day business school in the district, and it gave prizes to golfers in the district who scored holes–in–one. Id. at 437. The Fifth Circuit concluded these contacts in the aggregate were not sufficient to justify a finding that the PGA transacted business in Louisiana. Id. at 438. In addition, the court noted that "a professional association does not 'transact business' in a judicial district merely because some of its members reside in the district and receive the association's publications there." Id. at 437–38.

In *Friends of Animals, Inc.*, 310 F.Supp. at 620, a district court had before it facts similar to those in this case. In Friends of Animals, the American Veterinary Medical Association, Inc. ("AVMA") sought dismissal of the antitrust suit as to itself on the ground that venue and extraterritorial service were improper. The AVMA was a voluntary professional society comprised of

nearly 20,000 veterinarians. It had no office, employee or agent in the district and was not authorized to do business therein. *Id.* at 622. The association had .9% of its total membership residing in the district; two meetings in the last seven years were held in the district; two magazines were distributed to members and non–members in the district; three of its employees had traveled to the district on business in the year prior to the filing of the action; and the AVMA received $12,900 in advertising revenue from the district. *Id.* at 622–23. The court concluded that "[t]he occasional and sporadic 'business transactions' cited above which have been engaged in by AVMA in this District fail to meet the requirement of substantiality which is a component of the [transaction of business test]." *Id.* at 624. The court also stressed that a professional association cannot be subjected to suit in a district on the basis that members reside and publications are circulated therein. *Id.*[6] The most recent pronouncement fully in accord with the foregoing authorities is found in *State of New York v. American Medical Association, et al.*, Docket No. 79C1732 (E.D.N.Y.1980).

Based upon the above case law as applied to the present controversy, the Court finds that venue is not proper as to defendant ACR since its contacts with this district are too tenuous to satisfy the requirements of § 12 of the Clayton Act.[7] Thus, extraterritorial service of process upon it was improper and jurisdiction cannot be exercised over it in this district pursuant to the Clayton Act.

### 2. *AMA*

■ The Court next considers the circumstances of AMA. The affidavit of James H. Sammons, M.D. ("Affidavit of Sammons") indicates that the AMA is not licensed to do business in Iowa, has no office, employees, or agents[8] in Iowa, and has no property and makes no purchases in Iowa. The AMA has not held any meetings, seminars or workshops in Iowa; the legislative body of the AMA, the House of Delegates, has never met in Iowa; and the Board of Trustees which is responsible for the budget and day to day activities has never met in Iowa. 1.3% of its members reside in Iowa and receive publications, newsletters, and other information from the AMA, and are subject to its canon of ethics. The plaintiff further contends that the AMA accredits hospitals, medical schools, and residency programs in Iowa. The affidavit of Sammons attached to defendants' reply memorandum filed April 21, 1980 describes in detail AMA's accreditation activities. On the basis of this uncontested affidavit, the Court finds that the AMA does not accredit hospitals or medical schools; instead, separate entities comprised of representatives of several health related organizations have these accreditation responsibilities.[9] Two AMA employees did visit

**6.** See also *Bogus*, 389 F.Supp. at 330; *Wentling v. Popular Science Publishing Company, Inc.*, 176 F.Supp. 652, 657 (M.D.Pa.1959).

**7.** The Court recognizes plaintiff's reliance on *Levin v. Joint Commission on Accreditation of Hospitals*, 354 F.2d 515 (D.C.Cir.1965) and *Lee v. Ply Gem Industry, Inc.*, 593 F.2d 1266 (D.C. Cir.), cert. denied, 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979) for a contrary result, but finds these cases distinguishable.

**8.** Plaintiff alleges in its resistance to defendant AMA's motion that the AMA has a field representative in Iowa but has not offered any proof. Sammons' affidavit, however, indicates otherwise, and legal counsel for the AMA stated emphatically that there is no Iowa field representative, and the Court so finds.

**9.** HCEC attempts on several occasions to attribute the activities of various entities to defendants AMA and ACR. It is clear, however, that the Joint Commission on the Accreditation of Hospitals, the Liaison Committee on Medical Education, the Liaison Committee on Graduate Medical Education, and the local medical associations are separate legal entities whose activities must be viewed independently of the activities of the AMA and ACR. See affidavit and supplemental affidavit of Sammons. See also *Golf City, Inc.*, 555 F.2d at 437; *Friends of Animals, Inc.*, 310 F.Supp. at 624; *Elizabeth Hospital, Inc. v. Richardson*, 167 F.Supp. 155, 158 (W.D.Ark.1958), aff'd, 269 F.2d 167 (8th Cir.), cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959).

Iowa in 1979 in connection with accreditation of a residency program.

In addition, the AMA had initiated contacts with Iowa through its Committee on Quackery.[10] The first chairman of the committee, John G. Thomsen, M.D., was a resident of Iowa. Robert Throckmorton, an attorney residing in Iowa, served as a representative for the AMA at the Coordination Meeting on Activities Against Quackery in 1964. According to the minutes of a Committee on Quackery meeting held November 13, 1964, Iowa was proposed as the target area for a pilot project to study aspects of the practice of chiropractic. The AMA through the quackery committee had the following additional contacts with the State of Iowa: (1) Mr. Doyl Taylor, Director of the Department of Investigation for the AMA, attended a meeting on October 25, 1967 in Des Moines, Iowa, of the Iowa Medical Society's Committee on Quackery in which activities adverse to chiropractic were discussed; (2) Iowa appears to have continually had a representative on the committee; (3) Dr. Sabatier, as a member of the Committee on Quackery, delivered a speech in Davenport, Iowa on chiropractic activities in 1967; (4) Dr. Sabatier, as a member of an investigative committee created by the Louisiana legislature, conducted extensive correspondence with leaders of national chiropractic associations while he was a member of the committee; (5) a slide presentation prepared by Dr. Sabatier on chiropractic was shown by Dr. Thomsen, chairman of the quackery committee, in Johnson County, Iowa; (6) Dr. Sabatier, while chairman of the AMA Committee on Quackery, had communications with H. Ronald Frogley, Vice President of Palmer College of Chiropractic in Davenport, Iowa; (7) leaflets, pamphlets and copies of other information were circulated by the AMA to the public as well as to state medical societies across the country regarding the practice of chiropractic and the activities of the AMA Committee on Quackery;[11] and (8) representatives of the AMA visited Palmer College of Chiropractic in Davenport, Iowa, and there were proposals for additional visits.

These additional contacts, which are gleaned from an examination of the exhibits attached to the complaint and offered by plaintiff at the hearing, indicate that the AMA, through the activities of its Committee on Quackery, has significant additional contacts with this state. Without further discovery, it is not possible to establish how many, if any, of the planned activities of the committee resulted in actual contacts with Iowa. It would not be in the interest of justice, however, to deprive plaintiff of the opportunity to pursue investigation of these planned activities. Therefore, when all of these activities are viewed together, the Court concludes that the AMA is "transacting business" of "substantial character" within this district in the "ordinary and usual sense". *Eastman Kodak Co.*, 273 U.S. at 373, 47 S.Ct. at 403. The nature of the contacts, their direct relationship to plaintiff's cause of action, and the fact that it is alleged the AMA made the practice of chiropractic a target, make it reasonable to subject the AMA to suit here. See *Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Assoc.*, 344 F.2d 860, 865 (9th Cir. 1965); *State of New York*, Docket No. 79CL732 at 21. Should further discovery reveal that the actual contacts of the committee did not follow the proposals outlined in the various exhibits, the contacts may be insufficient to constitute the transaction of business under § 12, and this issue could again be raised in a summary judgment motion.

In conclusion, since venue is proper as to defendant AMA in this district, § 12 of the Clayton Act authorizes extraterritorial service of process upon it, and this Court may exercise personal jurisdiction over it.

10. The plaintiff in its complaint alleges that the activities of this committee were a driving force in attempting to adversely affect the practice of chiropractic in Iowa.

11. As one-half the practicing chiropractors reside in Iowa, it is a fair inference that these leaflets and pamphlets reached Iowa.

### B.  *Iowa Long–Arm Statute*

#### 1.  *ACR*

ACR next contends that this court does not have jurisdiction and venue under the Iowa long–arm statute and the general federal venue statute.[12]

Iowa Code § 617.3, the state long–arm statute, provides:

> If a foreign corporation . . . commits a tort in whole or in part in Iowa against a resident of Iowa, such acts shall be deemed to be doing business in Iowa by such foreign corporation for the purpose of service of process or original notice on such foreign corporation under this section, and, if the corporation does not have a registered agent or agents in the state of Iowa, shall be deemed to constitute the appointment of the secretary of state of the state of Iowa to be its true and lawful attorney upon whom may be served all lawful process or original notice in actions or proceedings arising from or growing out of such . . . tort.

There is a two part test by which in personam jurisdiction over defendant ACR allegedly obtained pursuant to Iowa Code § 617.3 must be judged.  First, there must have been a tort committed in whole or in part in Iowa against an Iowa resident to satisfy the long–arm statute.  Second, defendant ACR must have sufficient minimum contacts with the State of Iowa to satisfy constitutional requirements so that maintenance of this action in Iowa does not offend "traditional notions of fair play and substantial justice."  *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

The law of the State of Iowa controls on the question of whether the state long–arm statute applies in this case.  *Caesar's World, Inc. v. Spencer Foods, Inc.*, 498 F.2d 1176, 1179 (8th Cir. 1974).  The Iowa Supreme Court construes the statute narrowly, *Creative Communication Consultants, Inc. v. Byers Transportation Co., Inc.*, 229 N.W.2d 266, 268 (Iowa 1975), and has noted that the statute was not intended to go "to the full extent of constitutional authority".  *Gravelie v. TBS Pacific, Inc.*, 256 N.W.2d 230, 232 (Iowa 1977).[13]  Section 617.3 may be utilized for effecting service of process upon ACR, a nonresident corporation.  The plaintiff alleges that the assignors are Iowa chiropractors who were injured by ACR's allegedly tortious conduct.  Section 617.3 may be used to effect service of process even though acts causing injury in Iowa may have occurred outside of Iowa.  See *Edmundson v. Miley Trailer Co.*, 211 N.W.2d 269 (Iowa 1973); *Anderson v. Nat'l Presto Indus., Inc.*, 257 Iowa 911, 135 N.W.2d 639, 643 (1965).

The Court must now determine if assertion of jurisdiction over ACR would be constitutionally permissible.  The Eighth Circuit in *Caesar's World Inc.*, 498 F.2d at 1180, sets out five factors to be considered in determining if the exercise of jurisdiction pursuant to Iowa Code § 617.3 satisfies constitutional due process:

> (1) the nature and quality of the contacts with the forum state;  (2) the quantity of the contacts with the forum state;  (3) the relation of the cause of action to the

---

**12.**  The Court recognizes that § 12 of the Clayton Act does not set forth the exclusive method for service of process upon out of state defendants.  Under Federal Rule of Civil Procedure 4(d)(7) and (e), service upon a party not an inhabitant of or found within the forum state may be made "under the circumstances and in the manner prescribed" in the forum's state's statutes or rules.

The Court further recognizes that the venue provisions of § 12 of the Clayton Act supplement the general federal venue provisions and does not preempt them.  *United States Dental Institute v. American Association of Orthodontists*, 396 F.Supp. 565, 573 (N.D.Ill.1975).

Defendant AMA's assertion that jurisdiction and venue over it is improper under the Iowa long–arm statute and the general federal venue statute need not be considered since it is properly before this Court under § 12 of the Clayton Act.

**13.**  Iowa Rules of Civil Procedure 56.1 and 56.2 do allow service of process on any individual, personal representative, corporation, association, or partnership to the fullest constitutional extent.  Counsel for plaintiff, however, indicated in the hearing before this Court that service had not issued pursuant to these rules.

contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

As the court indicates, these do not establish a mathematical formula for analyzing the defendant's contacts, but rather serve as a general guide. *Id.* In addition, the Eighth Circuit has stated that the first three factors are of "primary" concern and that the latter two are of "secondary" importance. *Toro Company v. Ballas Liquidating Co.*, 572 F.2d 1267, 1270 (8th Cir. 1978); *Gardner Engineering Corp. v. Page Engineering Co.*, 484 F.2d 27, 31 (8th Cir. 1973).

■■■ The Court first considers the nature and quality of the contacts of ACR with Iowa. Such contacts were analyzed as part of the Court's consideration of § 12 of the Clayton Act. The Court concluded that the only contacts ACR had established with Iowa related to the existence and servicing of resident members. The organization had no agents, officers, employees or facilities in Iowa, nor purchased or sold property in Iowa. The Court recognizes that physical presence in the forum is not essential for the assertion of jurisdiction. *Kagin's Numismatic Auctions, Inc. v. Criswell*, 284 N.W.2d 224, 229 (Iowa 1979); *Norton v. Local Loan*, 251 N.W.2d 520, 522 (Iowa 1977). On the other hand, if a party is not present in the forum state, a closer look must be taken at the alleged contacts. The Eighth Circuit in *Iowa Electric Light & Power Co. v. Atlas Corporation*, 603 F.2d 1301, 1302–06 (8th Cir. 1979), cert. denied, 445 U.S. 911, 100 S.Ct. 1090, 63 L.Ed.2d 327 (1980), noted that the defendant was not present in any form within the forum state of Iowa and concluded that the seller's knowledge that a product was destined for the forum was not necessarily a sufficient contact, absent other voluntary contacts, to subject it to jurisdiction.

In addition, the quality of defendant ACR's contacts with Iowa do not enhance a finding of jurisdiction. Its contacts with Iowa consist only of members residing in Iowa and mailings related to membership being sent into this state.

■■ The second jurisdictional guideline directs the Court to consider the quantity of contacts with the forum state. Defendant ACR has less than one percent of its membership residing in Iowa, and makes mailings related to membership into the state. The frequency of mailings by the organization is not known. As HCEC indicates, jurisdiction over a defendant can be found to be constitutionally permissible even if that party's contact with the forum state flows from a single occurrence. *Norton*, 251 N.W.2d at 522; *Edmundson* 211 N.W.2d at 272. It is equally true, however, that a defendant can have several contacts with the forum and not be amenable to suit therein. *Rath Packing Co. v. Intercontinental Meat Traders*, 181 N.W.2d 184, 188–89 (Iowa 1970).

The third primary factor to be considered is the relation of the cause of action to the contacts. ACR's contacts fail to satisfy this critical requirement. Plaintiff alleges that the defendant ACR violated §§ 1 and 2 of the Sherman Act, and tortiously interfered with prospective business relationships. It does not appear from the record, however, that the plaintiff's cause of action relates directly to ACR's contacts with Iowa, i. e. membership and membership mailings.

In *Toro Company*, 572 F.2d at 1267, the issue before the court was whether it could constitutionally assert jurisdiction over a foreign corporation under Minnesota's long-arm statute when the corporation's connections with the forum were unrelated to the claim. *Id.* at 1269. The Eighth Circuit held that it would be constitutionally impermissible to do so if the claim sued upon is unrelated to defendant's contacts with the forum. As it would have " 'no reason to expect to be haled before [the forum state's] court[s].' " *Id.* at 1271. The Supreme Court in *Shaffer v. Heitner*, 433 U.S. 186, 207, 97 S.Ct. 2569, 2581, 53 L.Ed.2d 683 (1977) reached a similar conclusion in a case where jurisdiction over the defendant was sought on the basis of defendant's ownership of property in the state. Although the case at bar involves the question of in

personam jurisdiction and the above–cited Supreme Court decision considers in rem and quasi in rem jurisdiction, the controlling significance that the Supreme Court placed on the relationship of a defendant's contacts with the forum and the claim being asserted by plaintiff is equally applicable to. personal jurisdiction questions. See also *Rush v. Savchuk*, 444 U.S. 320, 327–31, 100 S.Ct. 571, 577–78, 62 L.Ed.2d 516 (1980).[14]

■ The Court is of the opinion that the nature, quality and quantity of ACR's contacts with Iowa are so limited and their relationship with the cause of action is so tenuous that any assertion of personal jurisdiction over defendant ACR pursuant to Iowa Code § 617.3 would be constitutionally impermissible as a violation of the "traditional notions of fair play and substantial justice". Thus, HCEC could not gain personal jurisdiction over defendant ACR through extraterritorial service of process under either § 12 of the Clayton Act or Iowa Code § 617.3, and the complaint must be dismissed as to defendant ACR.[15]

### 2. *Dr. Sabatier*

In his motion to dismiss, Dr. Sabatier challenges any assertion of jurisdiction and venue over him in this district under the federal antitrust laws, the Iowa long–arm statute, or the general federal venue statute, 28 U.S.C. § 1391.

Rule 4(d)(7) and (e) of the Federal Rules of Civil Procedure provides that service of process upon a defendant is sufficient if it is served pursuant to federal statute or in the manner prescribed by the law of the forum state.

■ HCEC appears to base extraterritorial service of process upon federal as well as state law. This Court is unable to find any federal statutory provision authorizing service upon Dr. Sabatier outside of Iowa. As the court in *Athlete's Foot of Delaware*, 445 F.Supp. at 48, explains:

> Section 5 of the Sherman Act, 15 U.S.C. § 6 and § 15 of the Clayton Act, 15 U.S.C. § 25, authorize extraterritorial service only in suits brought by the government, and § 12 of the Clayton Act, 15 U.S.C. § 22, authorizes such service only in the context of suits against corporations. Although § 4 of the Clayton Act, 15 U.S.C. § 15, authorizes civil suits against non–corporate defendants . . . it does not authorize service in a district other than that in which the suit is brought.

Therefore, this Court cannot have personal jurisdiction over Dr. Sabatier based upon federal statute.

■ Plaintiff can, however, attempt to bring this defendant before the Court under the Iowa long- arm statute, Iowa Code § 617.3.[16] The Court earlier engaged in a

**14.** In a companion case to *Rush v. Savchuk*, the Supreme Court in *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), held that an Eastern auto dealer and wholesaler would not be subject to jurisdiction in a products liability case initiated in the place of injury, Oklahoma. The Supreme Court indicated that the only "affiliating circumstance" with the forum was the fortuitous injury there, and concluded on the basis of this fortuitous contact and the lack of foreseeability that defendants had no "contacts, ties or relations" with Oklahoma so as to satisfy *International Shoe Co. v. Washington*. *Id.* 100 S.Ct. at 568. This Court does not believe that this recent decision in any way alters the prior law applicable to the present jurisdictional controversy, and is confident that the Eighth Circuit's distillation of such prior cases into a five factor "test" remains valid.

**15.** Since the Court has reached this conclusion, it need not consider whether venue would be appropriate under the general federal venue statute, 28 U.S.C. § 1391.

**16.** As it relates to nonresident individuals, § 617.3 provides:

> If a nonresident person makes a contract with a resident of Iowa to be performed in whole or in part by either party in Iowa, or if such person commits a tort in whole or in part in Iowa against a resident of Iowa, such acts shall be deemed to be doing business in Iowa by such person for the purpose of service of process or original notice on such person under this section, and shall be deemed to constitute the appointment of the secretary of state of the state of Iowa to be the true and lawful attorney of such person

comprehensive analysis of the long–arm statute as it related to defendant ACR, and references will be made to that discussion to avoid repetition. In considering the two–part test for judging the assertion of jurisdiction over Dr. Sabatier, the Court first finds that § 617.3 can be utilized under F.R.C.P. 4(d)(7) and (e) to effect service of process on this noncorporate defendant. Dr. Sabatier is an alleged wrongdoer under plaintiff's antitrust and tortious interference claims, and the plaintiff has alleged injury caused to resident chiropractors as a result of the interference. Again, as was the case with defendant ACR, § 617.3 may be utilized even though the acts causing injury to residents in Iowa occurred outside of Iowa. See *Edmundson*, 211 N.W.2d at 269; *Anderson*, 135 N.W.2d at 639. In addition, Dr. Sabatier allegedly committed acts resulting in injury while in this state.

The Court next must ascertain if the exercise of jurisdiction under § 617.3 satisfies constitutional due process. In so doing, the test articulated by the Eighth Circuit in *Caesar's World, Inc.*, 498 F.2d at 1180 must be applied.

(a) *Nature and quality of contacts.*

According to the affidavit of Joseph A. Sabatier, Jr., M.D. ("affidavit of Sabatier") attached to his motion, this defendant resides and practices medicine in Louisiana, where he is licensed to do so. He states that he never resided, practiced or was licensed to practice medicine in Iowa; never has been a member of the Iowa Medical Society; has no agent, employees or offices in Iowa; and owns no property and makes no purchases in Iowa. Sabatier admits that he gave a speech in Davenport, Iowa several years ago while serving on the Committee on Quackery of the AMA. In addition, plaintiff contends and defendant does not dispute that he carried on correspondence with leaders of national chiropractic associations while serving on the Committee on Quackery.

Dr. Sabatier's other contacts with Iowa include a slide presentation on chiropractic prepared by him which was shown by the chairman of the quackery committee in Johnson County, Iowa; written communications by him while he was chairman of the AMA Committee on Quackery to H. Ronald Frogley, Vice President of Palmer College of Chiropractic in Davenport, Iowa and a visit to the Palmer College.

(b) *Quantity of contacts*

As is obvious from the discussion above, Sabatier has had significantly more than a few isolated contacts with this state.

(c) *Relation of contacts to cause of action*

Unlike the circumstances of defendant ACR, the alleged contacts of Sabatier are related to plaintiff's cause of action. The complaint alleges that Sabatier as a member of the Committee on Quackery participated in the violations of §§ 1 and 2 of the Sherman Act and the state common law of tort. Because his contacts with Iowa arise from this membership and his activities as a member of the AMA Committee on Quackery, the contacts are directly related to the cause of action.

The Court finds that Dr. Sabatier has sufficient contacts with this district to justify the assertion of jurisdiction over him without violating his constitutional right to due process. Because of the nature and quality, quantity, and relationship of the contacts to the forum, the Court is convinced that subjecting Dr. Sabatier to suit would not violate "traditional notions of fair play and substantial justice." *International Shoe Co.*, 362 U.S. at 316, 66 S.Ct. at 158. Therefore, the Court concludes that personal jurisdiction was properly obtained over defendant Dr. Sabatier through extra–territorial service of process pursuant to Iowa Code § 617.3.

 The Court next must determine if venue as to Dr. Sabatier is properly laid in this district under the general federal venue statute, 28 U.S.C. § 1391. The applicable provisions of this venue statute, § 1391(b), provides:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship arising from or growing out of such contract or tort.

upon whom may be served all lawful process or original notice in actions or proceedings

may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

Obviously, all defendants do not reside in Iowa. As a result, the Court must determine where plaintiff's claim arose. An antitrust claim arises "where the contacts weigh most heavily". *Athlete's Foot of Delaware*, 445 F.Supp. at 45; *ABC Great States, Inc. v. Globe Ticket Company*, 310 F.Supp. 739, 743 (N.D.Ill.1970); *Philadelphia Housing Authority*, 291 F.Supp. at 260. Further, even when a conspiracy is alleged by plaintiff, the Court must evaluate the appropriateness of venue in the forum as to each individual defendant. *ABC Great States, Inc.*, 310 F.Supp. at 743; *Philadelphia Housing Authority*, 291 F.Supp. at 262.

■ Based upon the above principles as applied to the circumstances of defendant Dr. Sabatier, the Court finds that plaintiff's claim against this defendant arose in Iowa. The contacts weigh most heavily here, where defendant delivered his speech challenging chiropractic, where his slide program on chiropractic was presented, and where he directed letters to officials of a chiropractic college and national chiropractic associations. Admittedly, Sabatier as a member of the AMA Committee on Quackery did participate in its meetings held in Illiniois, but the bulk of those activities alleged by the plaintiff as a basis for the federal claims of these Iowa assignors took place in Iowa. Defendant Sabatier's overt conspiratorial acts were committed in Iowa. Therefore, Sabatier's motion to dismiss for lack of venue must be denied.

■ Two final points must be discussed in regard to jurisdiction and venue. HCEC in its resistance requested the Court, if it found venue or jurisdiction lacking as to one or more defendants, to allow it the opportunity to discover facts relevant to such determinations rather than dismissing the parties. The Court rejects this request. Six months elapsed before the dismissal motions were filed by defendants; two months elapsed from the time the motions were filed giving plaintiff notice of the issues until the hearing was held on the merits of the motions. The Court at no time during this period was approached with a request for discovery relevant to the issues raised in the preliminary motions. As a result, the Court will not at this time delay the progress of the lawsuit by allowing plaintiff the opportunity to conduct discovery for the purpose of uncovering information for further resistance of defendant ACR's motion.

Plaintiff also requests in the event the Court deems venue improper as to any moving defendants that the action be transferred as it pertains to such defendants pursuant to 28 U.S.C. § 1406(a). Since the Court concluded that it did not have jurisdiction over ACR, and that defendants AMA and Dr. Sabatier are properly before it for both jurisdictional and venue purposes, the Court need not consider plaintiff's request.

## III. STATE ACTION DOCTRINE AND THE McCARRAN–FERGUSON ACT

Defendants Blue Cross of Iowa ("Blue Cross") and Blue Shield of Iowa ("Blue Shield") filed Motions to Dismiss plaintiff's complaint as to them on several grounds. Because additional claims are discussed in other sections of this opinion, the Court will only consider defendants' claims that under the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 350–52, 63 S.Ct. 307, 313 14, 87 L.Ed. 315 (1943), and the McCarran Ferguson Act they are exempt from the antitrust claims alleged in Count I of the complaint. In addition, the Court has before it defendant Norman Pawlewski's ("Pawlewski") claim in his motion to dismiss Court I of the complaint that he is exempt from antitrust scrutiny under the state action doctrine of *Parker v. Brown*.

### A. State Action Doctrine

#### 1. Defendants Blue Cross and Blue Shield

Blue Cross and Blue Shield contend that their failure to provide insurance coverage for chiropractic care is exempt from antitrust challenge to the extent defendants are alleged to have boycotted plaintiff's members because Iowa law regulates their insur-

ance coverage of health services. Blue Cross and Blue Shield base their contention on *Parker v. Brown.*

Iowa Code Chapter 514 governs the activities of any corporation organized under that chapter for the purpose of establishing, maintaining and operating health service plans described therein. Under § 514.1, such a corporation may administer four types of health service plans: (1) a hospital service plan "whereby hospital service may be provided by the said corporation or by a hospital with which it has a contract for such service, to such who become subscribers to said plan under a contract which entitles each subscriber to hospital service"; (2) a medical and surgical service plan "whereby medical and surgical service may be provided at the expense of said corporation, by duly licensed physicians and surgeons, dentists, podiatrists, osteopathic physicians, or osteopathic physicians and surgeons, to subscribers under contract, entitling each subscriber to medical and surgical service, as provided in said contract"; (3) a pharmaceutical service plan; and (4) an optometric service plan.

Hospital service corporations are authorized to contract with subscribers for the rendering of specifically defined services. Iowa Code § 514.5 (Supp.1979). Medical service corporations are authorized under the same section to contract with subscribers "to furnish medical and surgical service through physicians and surgeons, dentists, podiatrists, osteopathic physicians, or osteopathic physicians and surgeons." *Id.* Section 514.17 directs, however, that a medical service corporation cannot operate until it has contracted with specified numbers of physicians and surgeons, dentists, osteopathic physicians and surgeons, or podiatrists who must be licensed under the applicable provisions of state law.

Regulation of health service corporations does not end there. Pursuant to § 514.3, the articles of incorporation of hospital and medical service corporations must be approved by the Commissioner of Insurance. The Commissioner must also approve the rates charged subscribers, § 514.6; the con-

tracts entered into with subscribers, § 514.7; the contracts entered into with participating hospitals or participating "physicians and surgeons, dentists, podiatrists, osteopathic physicians, or osteopathic physicians and surgeons", § 514.8; and acquisition and administration costs, § 514.11. Further, all health service corporations must report annually to the Commissioner under § 514.9 and are subject to examination under § 514.10.

The Eighth Circuit Court of Appeals very recently had before it an antitrust action against the Bell System ("Bell") in which plaintiff alleged violations of §§ 1, 2, and 3 of the Sherman Act, and of Iowa tort law. *Sound, Inc. v. Bell System,* 631 F.2d 1324 (8th Cir. 1980). The court was confronted with the issue of whether Iowa's regulation of Bell's rate structure exempted it from antitrust scrutiny under *Parker v. Brown's* state action doctrine. Pursuant to its consideration of this issue, the circuit court analyzed the major United States Supreme Court state action exemption cases. Id. at 1332–1334. Rather than restating that analysis here, the Court relies upon the Eighth Circuit's discussion of the relevant case law and will proceed to apply it to the facts of the present case.

The Eighth Circuit in *Sound, Inc.,* at 1334–1335 articulated four factors to be considered in making a determination on the applicability of the state action exemption: (a) "the existence and nature of any statutorily expressed policy;" (b) "the nature of the regulatory agency's interpretation and application of its enabling statute, including the accommodation of competition by the regulator;" (c)"the fairness of subjecting a regulated private defendant to the mandates of antitrust law;" and (d) "the nature of extent of the state's interest in the specific subject matter of the challenged activity."

(a) *Statutorily Expressed Policy*

Chapter 514 of the Iowa Code clearly expresses a policy excluding chiropractic services from coverage by health care service corporations. Throughout that chapter, the state legislature repeatedly

stated precisely the particular services covered. No mention is ever made of chiropractors, the practice of chiropractic or Chapter 151 of the Iowa Code which governs aspects of the practice of chiropractic, including licensing. The Court believes that the omission of any mention of chiropractic coverage in Chapter 514 directly suggests that the legislature intended to prohibit coverage of their activities by health care service corporations.

The legislative history of Chapter 514 supports this conclusion. As originally enacted in 1939,[17] the original law applied to hospital services only; it contained no authorization of a health service plan covering medical or surgical services provided by physicians or other health care practitioners. Acts, 48 G.A., Reg.Sess., Ch. 222 (1939). The statute was amended in 1945 for the purpose of "authoriz[ing] nonprofit corporations to contract to furnish medical and surgical service to subscribers and to contract for the furnishing of such service with physicians and surgeons, osteopathic physicians or posteopathic physicians and surgeons." Acts, 51 G.A. Reg.Sess., Ch. 209 (1945).

Chapter 514 has been subject to further amendment since 1945. Each subsequent pertinent amendment by the legislature extended coverage in health care service plans to include other services.[18] The Iowa legislature, however, has never exercised its judgment on behalf of the citizens of Iowa to permit health care service corporations to cover chiropractic services.

The case at bar is unlike *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), and *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). In *Cantor*, 428 U.S. at 585, 96 S.Ct. at 3115, the Supreme Court found that the state's policy was neutral on whether a light bulb exchange program should be conducted by a utility. Similarly, in *Goldfarb*, 421 U.S. at 790, 95 S.Ct. at 2015, the Supreme Court held that the fee schedule was not mandated by the state supreme court. Instead, the facts herein are more akin to those found in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), and *California Retail Liquor Dealers Association v. Midcal Aluminum*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). In *Bates*, 433 U.S. at 362, 97 S.Ct. at 2698, the Supreme Court concluded that the disciplinary rules of the state supreme court restricting attorney advertising reflected a clear statement of state policy. The legislature has clearly formulated its policy herein prohibiting coverage of chiropractic services by not amending Chapter 514 of the Iowa Code to allow coverage. Thus, this case resembles *Midcal Aluminum*, 445 U.S. at 104–05, 100 S.Ct. at 943, wherein the court held that the state policy of imposing restrictions on wine prices was clearly stated.

The plaintiff argues, however, that Chapter 514 in no way prohibits defendants from directly reimbursing subscribers for chiropractic services, as opposed to reimbursing chiropractors with whom defendants contract for providing services to subscribers. The Court rejects plaintiff's reading of Chapter 514. Chapter 514 on its face removes any discretion or business judgment with respect to coverage by health care service corporations of chiropractic services. This chapter provides that a medical and surgical service plan may provide certain services to subscribers; there is no requirement that reimbursement go only to a participating health care professional. Iowa Code § 514.1 (Supp.1979). The same is true under § 514.5 where the legislature outlines the services that may be furnished to subscribers by contract. Chapter 514 prohibits,

17. As originally enacted, the statute was entitled "An Act to Authorize Nonprofit Corporations to Contract to Furnish Hospital Service to Subscribers and to Contract with Hospitals to Furnish Hospital Service . . .".

18. Dental services were added in 1955. Acts, 56 G.A., Reg.Sess., Ch. 244 (1955). Podiatric services were added in 1965. Acts, 61 G.A., Reg.Sess., Ch. 397 (1965). Pharmaceutical Services were added in 1967. Acts, 62 G.A., Reg.Sess. Ch. 369 (1967). The most recent addition came in 1969 and resulted in coverage of optometric services. Acts, 63 G.A., Reg. Sess., Ch. 271 (1969).

therefore, the coverage of chiropractic services under service plans regardless of whether subscribers are directly reimbursed or payments are made to participating health care professionals.

### (b) *The Regulatory Agency's Interpretation*

There is nothing before the Court outlining the activities of the Commission on Insurance pursuant to the statutory scheme in question. The record does indicate, however, that both the Attorney General and the Governor of the State of Iowa have issued opinions relevant to the issue of eligibility for coverage of chiropractic services under Chapter 514. Governor Robert D. Ray concluded that "eligibility for [chiropractic] benefit under Chapter 514 is prevented as a matter of law" and "eligibility for Blue Cross and Blue Shield benefits must be by statutory revision." Iowa Administrative Bulletin, Vol. II, No. 9 at 527 (Oct. 31, 1979). In an Attorney General's opinion issued March 26, 1980, considering whether physical therapists could be directly reimbursed under Chapter 514 service plans, it is stated:

> Being creatures of statutes, service corporations under Section 514.1 can contract for these services only and only with those persons or entities listed in Chapter 514; hospitals or corporations, associations, or individuals providing hospital service; physicians and surgeons; dentists; podiatrists; osteopathic physicians and surgeons; pharmacies; and optometrists.

The Court believes both opinions provide further support for its conclusions.

### (c) *Fairness*

Defendants Blue Cross and Blue Shield lack any discretion or opportunity to exercise business judgment on coverage of chiropractic services. If a state's regulation of a private party's activities is so pervasive as to forbid certain actions, it would be inherently unfair to subject the regulated entity to antitrust scrutiny based on failure to act. This factor in the case at bar distinguishes it from *Cantor*. In *Cantor*, 428 U.S. at 594, 96 S.Ct. at 3119, the Supreme Court found that the option of whether or not to undertake the light bulb program was primarily within the regulated defendant's discretion. "[T]here was 'nothing unjust' in requiring the utility to make business choices that conformed to federal law." *Sound, Inc.*, at 1333. In this case, the Court must conclude that the state's involvement through Chapter 514 is "so dominant that it would be unfair to hold a private party responsible . . .". *Cantor*, 428 U.S. at 594–95, 96 S.Ct. at 3119 -20.

### (d) *The State's Interest*

██ The nature and extent of the State's interest in the challenged activity must be weighed. The challenged activity is the refusal to provide service plan coverage for chiropractic services. The state unquestionably has a strong interest in the regulation of health care. Iowa's interest in regulating health care services is similar to Arizona's interest in regulating the bar to protect the public. *Bates*, 433 U.S. at 361, 97 S.Ct. at 2697.

Based upon the preceding discussion, to the extent HCEC in Count I alleges that defendants Blue Cross and Blue Shield boycotted or refused to deal with chiropractors, the Court concludes that these defendants are exempt from antitrust scrutiny under the state action doctrine of *Parker v. Brown*.

### 2. *Defendant Norman Pawlewski*

Defendant Pawlewski, Commissioner of Public Health for the State of Iowa, contends that the acts alleged in plaintiff's complaint are exempt from the antitrust laws because they were required by state laws.

As the plaintiff indicates in its resistance, the Court must carefully review the statutory scheme that vests the defendant state official with his power in order to determine if his activities are exempt from antitrust scrutiny. The powers and duties of the Commissioner of Public Health are outlined in Chapter 135 of the Iowa Code. Under § 135.11(1), he must "exercise general supervision over the public health, pro-

mote public hygiene and sanitation, and unless otherwise provided, enforce the laws relating to the same." The Commissioner is directed to establish departmental divisions for the purpose of properly enforcing the laws administered by it; one such division concerns examinations and licenses. Iowa Code § 135.11(14) (Supp.1979). In addition, the Commissioner is to "[e]stablish, publish and enforce rules not inconsistent with law for the enforcement of the provisions of this title and for the enforcement of the various laws, the administration and supervision of which are imposed upon the department." Iowa Code § 135.11(15) (Supp. 1979).

Other statutory provisions relevant to this case in light of HCEC's allegations include: § 151.5 prohibits chiropractors from practicing operative surgery, osteopathy, or administering any drug or medicine; § 147.87 charges the state health department with the responsibility to enforce the chapter concerning chiropractors and to investigate if necessary; § 147.60 requires the state health department to direct the Attorney General to file petitions against licensees for revocation or suspension of licenses either on its own motion or on the basis of information received from a person residing in the county where the licensee practices; and § 147.92 provides that "[u]pon request of the state department of health the attorney general shall institute in the name of the state the proper proceedings against any person charged by the department with violating any provisions [of the code]."

■ The case at bar, as it relates to Pawlewski, involves a claim against a public official rather than a private party. Anticompetitive activities of a state agency can be exempt if they are mandated by explicit language in state statute or such a mandate can be implied from the nature of powers and duties given it. *Duke & Company, Inc. v. Foerster*, 521 F.2d 1277, 1280 (3rd Cir. 1975); *Mason City Center Associates v. City of Mason City, Iowa*, 468 F.Supp. 737, 742 (N.D.Iowa). If a monopoly is mandated by state statute or such a mandate can be inferred from the agency's duties, activities undertaken pursuant to the state created monopoly are exempt from antitrust laws. *Kurek v. Pleasure Driveway*, 557 F.2d 580, 590 (7th Cir.), vac. 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1977), orig. judg. reinstated, 583 F.2d 378 (7th Cir. 1978), cert. denied, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979); *Ladue Local Lines, Inc. v. Bi–State Development Agency*, 433 F.2d 131, 137 (8th Cir. 1970). If the activities, however, fall outside the scope of the state actor's powers or duties, or are taken in bad faith, the exemption is lost. *Duke & Co.*, 521 F.2d at 1280.[19] The Court, therefore, must determine if the challenged restraint is " 'one clearly articulated and affirmatively expressed as a state policy'; second, the policy must be 'actively supervised' by the state itself." *Midcal Aluminum*, 445 U.S. at 104-05, 100 S.Ct. at 943. See also *Mason City Center Association*, 468 F.Supp. at 742.

The challenged activities of Pawlewski as alleged by plaintiff include: (1) Pawlewski in response to a directive from the Iowa legislature created an expert panel to review chiropractic in Iowa, but placed members on it who were "friendly to the [Iowa Medical Society] position against chiropractic ..."; (2) Pawlewski caused civil lawsuits to be initiated against two chiropractic doctors for exceeding the scope of their practice without sufficiently investigating their activities; and (3) Pawlewski participated in and furthered the boycott by "wrongful, ultra vires actions attempting to limit the scope of chiropractic licensure, constant monitoring of the practice of chiropractic in Iowa for the sole purpose of advancing the boycott conspiracy, and bringing improper prosecutions against chiropractors ...".

19. In *Allegheny Uniforms v. Howard Uniform Company*, 384 F.Supp. 460, 463 (W.D.Pa.1974), the district court found that the Port Authority acted beyond its statutory mandate in allegedly conspiring and agreeing that one company would serve as outlet for purchase of Port Authority uniforms. As a result of its "ultra vires and illegal" acts, the state action doctrine was inapplicable. *Id.*

■ The Court denies defendant Pawlewski's claim of exemption from the antitrust laws under *Parker v. Brown*. The allegations if proven would support a finding that Pawlewski acted outside the statutory mandate. See *Allegheny Uniforms v. Howard Uniform Company*, 384 F.Supp. 460, 463 (W.D.Pa.1974). Defendant Pawlewski contends that plaintiff alleges his actions were taken while exercising his position as Commissioner of Health, thus rendering his activities exempt and that he was compelled by the statutes to take the challenged actions. The Court recognizes that this defendant was directed to form an expert panel to study chiropractic in Iowa. Even if such a mandate by the legislature could be considered as "one clearly articulated and affirmatively expressed," the defendant is alleged to have acted outside the mandate by choosing biased members to sit on the panel. The plaintiff alleges that Pawlewski acted "ultra vires"; thus, the exemption is lost. *Duke & Co.*, 521 F.2d at 1280; *Allegheny Uniforms*, 384 F.Supp. at 463. The same conclusion must be reached as to the third challenged activity. The defendant certainly has the statutory mandate to monitor the practice of chiropractic in Iowa as well as to seek revocation of chiropractors' licenses. Iowa Code § 147.60 (1972). Defendant Pawlewski, however, is not mandated by a clear state policy to monitor the practice for the purpose of advancing a boycott of the practitioners, or to restrict licensure except on valid grounds.

The Court, therefore, finds that the challenged activities of defendant Pawlewski as alleged in plaintiff's complaint were not mandated by a " 'clearly articulated and affirmatively expressed . . . state policy.' " *Midcal Aluminum*, 445 U.S. 104–05, 100 S.Ct. at 943. Since the activity was not required by the state, defendant Pawlewski cannot claim an exemption from the antitrust laws under *Parker v. Brown*. *Gold-*

*farb*, 421 U.S. at 790, 95 S.Ct. at 2015; *Duke & Co.*, 521 F.2d at 1280. Thus, his motion to dismiss Count I of the complaint as to him must be denied.

### B. *McCarran–Ferguson Act*

In Count I of HCEC's complaint, it is alleged not only that defendants Blue Cross and Blue Shield boycotted and refused to deal with plaintiff's members,[20] but also that they monopolized, attempted to monopolize and conspired to monopolize "[t]he health care insurance business in Iowa." Defendants Blue Cross and Blue Shield seek dismissal of Count I insofar as it alleges a monopoly in some form on the basis of the statutory exemption contained in the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, for the "business of insurance."

Section 2(b) of the McCarran–Ferguson Act provides:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . ., unless such Act specifically relates to the business of insurance: Provided, that after June 30, 1948, . . . the Sherman Act, and . . . the Clayton Act, . . . shall be applicable to the business of insurance to the extent that such business is not regulated by state law.

15 U.S.C. § 1012(b) (1976). To determine the applicability of § 2(b), the Court must consider (1) if defendants Blue Cross and Blue Shield are engaged in the "business of insurance" and (2) if the challenged activities are regulated by state law. *National Gerimedical Hospital & Gerontology Center v. Blue Cross*, 479 F.Supp. 1012, 1016 (W.D. Mo.1979) aff'd sub nom. 628 F.2d 1050 (8th Cir. 1980).

■ In *Group Life & Health Insurance Co. v. Royal Drug Co., Inc.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the Su-

---

**20.** Under the state action doctrine of *Parker v. Brown*, the Court has already dismissed Count I of the complaint as to defendants Blue Cross and Blue Shield to the extent it is alleged they boycotted or refused to deal with assignor members of HCEC. As a result, the Court does not believe that it need consider if defendants are also exempt from the boycott charge under the McCarran–Ferguson Act. See *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978).

preme Court had before it an antitrust challenge to the defendants' alleged fixing of retail prices of drugs and pharmaceuticals through its "pharmacy agreements." [21] The Supreme Court held that the defendants were not exempt from application of the antitrust laws under § 2(b) of the McCarran–Ferguson Act because the pharmacy agreements were not the "business of insurance." In so deciding, the Supreme Court stated that "[t]he primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk." *Id.* at 211, 99 S.Ct. at 1073. The pharmacy agreements were characterized by the Supreme Court as arrangements for Blue Shield's purchase of goods and services, and not as involving the underwriting or spreading of risks. *Id.* at 214, 99 S.Ct. at 1074. Another key concept of "business of insurance" recognized by the Supreme Court was the contract between the insurer and the insured; the pharmacy agreements, however, involved the insurer and a third party. *Id.* at 215–16, 99 S.Ct. at 1075. As the Supreme Court described the distinction discussed therein, § 2(b) of the McCarran Ferguson Act exempts the "business of insurance" and not the business of insurance companies. *Id.* at 217, 218 n. 18, 99 S.Ct. at 1076.

The district court in *National Gerimedical*, 479 F.Supp. at 1012, had to determine if activities constituted the "business of insurance" for purposes of the McCarran–Ferguson Act. Plaintiff initiated the suit alleging violations of antitrust laws on the ground that Blue Cross improperly denied the plaintiff hospital a participating member contract. After a lengthy discussion of *Royal Drug Co.*, the Court noted the defendants' attempt to distinguish that case on the ground that the provider contract involved underwriting and spreading of risk, i. e., the business of insurance. *Id.* at 1018. The court rejected the defendants' arguments, however, and concluded that no rational basis existed for distinguishing the provider contracts. *Id.* The district court's decision was affirmed by the Eighth Circuit which stated:

> We agree, in all respects, with the district court's holding that [Royal Drug] ... controls .... Thus, we hold that the McCarran–Ferguson Act insurance exemption is not applicable in this case.

*National Gerimedical,* at 1057.

One final case is relevant to the Court's determination of whether defendants' activities constitute the "business of insurance." In *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 469 F.Supp. 552 (E.D.Va.1979), plaintiff sued defendants alleging that, as a result of a conspiracy in violation of § 1 of the Sherman Act, the fees of clinical psychologists would only be covered by Blue Shield to its subscribers if the services were ordered, supervised and billed by a physician. Pursuant to defendants' motions to dismiss, the court held that their activities were exempt under the McCarran–Ferguson Act. *Id.* at 563. In so holding, the court considered Royal Drug Co. and concluded that the contracts in question were the "business of insurance" because they were between Blue Shield as

---

**21.** These agreements were described by the court:

Blue Shield offers insurance policies which entitle the policyholders to obtain prescription drugs. If the pharmacy selected by the insured has entered into a "Pharmacy Agreement" with Blue Shield, and is therefore a participating pharmacy, the insured is required to pay only $2 for every prescription drug. The remainder of the cost is paid directly by Blue Shield to the participating pharmacy. If, on the other hand, the insured selects a pharmacy which has not entered into a Pharmacy Agreement, and is therefore a non-participating pharmacy, he is required to pay the full price charged by the pharmacy. The insured may then obtain reimbursement from Blue Shield for 75% of the difference between that price and $2.

Blue Shield offered to enter into a Pharmacy Agreement with each licensed pharmacy in Texas. Under the Agreement, a participating pharmacy agrees to furnish prescription drugs to Blue Shield's policyholders at $2 for each prescription, and Blue Shield agrees to reimburse the pharmacy for the pharmacy's cost of acquiring the amount of the drug prescribed. Thus, only pharmacies that can afford to distribute prescription drugs for less than this $2 markup can profitably participate in the plan. *Royal Drug Co.,* 440 U.S. at 209, 99 S.Ct. at 1072.

the insurer and the subscribers as the insureds. *Id.* at 562.

HCEC's claim focuses on defendants' alleged monopolization in some form of the health care insurance business in Iowa in violation of § 2 of the Sherman Act. Claims made pursuant to § 2 are aimed at "the acquisition or retention of effective market control." *TV Signal Co. v. American Telephone & Telegraph Co.*, 462 F.2d 1256, 1260 (8th Cir. 1972). The market control of concern in this case is the coverage of health care services to subscribers of a health care plan, the insureds. The Court believes the facts here are distinguishable from those found in *Royal Drug Co.* and *National Gerimedical.* Here, the issue involves the services being provided to insureds in Iowa by defendants Blue Cross and Blue Shield. The courts in *Royal Drug Co.* and *National Gerimedical* were faced with challenges to pharmacy agreements between insurer and third parties, and a refusal by an insurer to give plaintiff hospital a participating member contract, respectively. Both courts concluded that the challenges did not directly concern the relationship between the insurer and insured, and thus did not constitute the "business of insurance." *Royal Drug Co.*, 440 U.S. at 215–17, 99 S.Ct. at 1075–76; *National Gerimedical*, 479 F.Supp. at 1018.

Since the relationship of the insurer to insured is of central concern herein, the challenge involves the "business of insurance." This finding is consistent with the court's determination in *Virginia Academy*, 469 F.Supp. at 562. In addition, plaintiff's allegation that defendants monopolize health insurance coverage in Iowa raises a question regarding the spreading and underwriting of risks in Iowa. The defendants' monopoly, according to the plaintiff, prevents coverage to subscribers of chiropractic services. The Supreme Court in *Royal Drug Co.*, 440 U.S. at 211, 99 S.Ct. at 1073, noted that the spreading and underwriting of a policyholder's risks are primary elements of an insurance contract.

In determining the applicability of the McCarran–Ferguson Act, the Court next is required to decide if the challenged activities are regulated by state law. *National Gerimedical*, 479 F.Supp. at 1016. The Court earlier determined that the activities of defendants Blue Cross and Blue Shield are extensively regulated under state law pursuant to Chapter 514.[22] On the basis of this earlier discussion, the Court hereby finds that the defendants' activities are regulated under state law for purposes of § 2(b) of the McCarran–Ferguson Act.

Therefore, the Court concludes that defendants Blue Cross and Blue Shield are exempt from antitrust scrutiny pursuant to the McCarran–Ferguson Act, and Count I insofar as it alleges a monopoly in some form is dismissed as to them.

### IV. *42 U.S.C. § 1983*

In Count III of the complaint, HCEC alleges that defendant Pawlewski along with other defendants by their actions violated its assigning members' constitutional rights to equal protection and due process of law and seeks redress for the alleged violations pursuant to 42 U.S.C. § 1983. Defendant Pawlewski requests the Court to dismiss Count III as to him on two immunity grounds: a qualified immunity and Eleventh Amendment immunity. In the alternative, Pawlewski has filed a motion for more definite statement. Defendants Blue Cross and Blue Shield seek dismissal of Count III as to them because plaintiff's claims are conclusory, defendants cannot be found to have acted under color of state law, and the doctrine of derivative immunity precludes plaintiff's claims.

### A. *Immunity*

#### 1. *Qualified*

Governmental actors performing their duties in good faith sued in their individual capacities have available to them a qualified immunity from personal liability for damages. *Wood v. Strickland*, 420 U.S. 308, 315, 95 S.Ct. 992, 997, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d

22. See page 991 of this Order.

90 (1974). As a result, an official is personally liable for acts taken pursuant to his official duties if "he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [individual] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the [individual]." *Wood*, 420 U.S. at 322, 95 S.Ct. at 1001. Therefore, the existence of a qualified immunity for a governmental actor can only be established by an evidentiary showing of good faith and reasonableness. *Imbler v. Pachtman*, 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976); *Scheuer v. Rhodes*, 416 U.S. at 239, 94 S.Ct. at 1688. The Court does not believe it would be appropriate to dismiss the § 1983 claim against Pawlewski since there has been no evidence presented as to the good faith and reasonableness of his actions. As the Supreme Court indicated in *Imbler v. Pachtman*, 424 U.S. at 419 n. 13, 96 S.Ct. at 989 n. 13, a qualified immunity does not defeat a suit at the onset; instead, dismissal depends on the "circumstances and motivations [of the official], as established by the evidence at trial."

Therefore, defendant Pawlewski's Motion to Dismiss Count III on the basis of a claim of a qualified immunity is denied.

### 2. *Eleventh Amendment*

The Eleventh Amendment provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

This language has been interpreted to preclude suits against a state by its own citizens. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1973). The Supreme Court has further held that a suit may be barred even though a state is not a named defendant:

'[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.' [Citation omitted].

Thus the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from the public funds in the state treasury is barred by the Eleventh Amendment.

*Id.* Defendant Pawlewski wants Count III dismissed because "it is likely the state would indemnify [him] for damages awarded in this action ...". Indemnification in defendant's opinion causes this suit to be one for retroactive money damages which is barred under the Eleventh Amendment.

■ The Court recognizes that the state is required by statute to indemnify employees of the state for money damages awarded against him in actions brought under 42 U.S.C. § 1983 unless the claim is based upon the employee's malfeasance in office or willful and wanton conduct. Iowa Code § 25A.22 (1978). Defendant suggests that the state "likely" will indemnify him for damages awarded in this case because he was acting within the scope of his employment without malfeasance or willful and wanton conduct. Plaintiff in his complaint, however, alleges that defendant did act willfully and wantonly. As was the case with the claim of qualified immunity, the Eleventh Amendment claim cannot be decided on this motion to dismiss because the necessary evidence is not before the Court for determining if defendant could or could not be indemnified by the State. The question as to whether the voluntary assumption of a duty to indemnify by state statute waives the constitutional protection of the Eleventh Amendment will not be considered at this time.

Therefore, defendant Pawlewski's motion to dismiss Count III of the complaint on the basis of the Eleventh Amendment must be denied at this time.[23] The Court also denies

---

**23.** In light of the Court's denial of defendant Pawlewski's claims of immunity, defendants Blue Cross and Blue Shield's request for dismissal of Count III based upon the doctrine of derivative immunity is denied.

defendant's motion for more definite statement. Pawlewski has received adequate notice of the claims being asserted against him by plaintiff. The Court believes that additional information concerning plaintiff's claim in Count III can be gained through discovery.

### B. *Conclusory Allegations/Color of State Law*

 Defendants Blue Cross and Blue Shield moved to dismiss Count III as to them on the grounds that plaintiff insufficiently pled its case by making only conclusory allegations of a conspiracy among the defendants. Under Federal Rule of Civil Procedure 8, the Court believes that defendants have sufficient notice of plaintiff's conspiracy claim when Counts I and II are incorporated by reference into Count III.

These defendants further contend that Count III fails to state a claim as to them because they have in no way acted "under color of state law" as required under 42 U.S.C. § 1983. The Court must reject their claim at this stage in the proceedings. Plaintiff alleges in his complaint that the other defendants conspired with defendant Pawlewski to violate the assignor members' constitutional rights in numerous ways. A private individual can be found to be acting under color of state law within the meaning of § 1983 if that individual allegedly conspired with state officials to deprive another of his constitutional rights. *Adickes v. S.H. Kress*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Dennis v. Hein*, 413 F.Supp. 1137, 1140 (D.S.C.1976); *Canty v. City of Richmond, Virginia, Police Department*, 383 F.Supp. 1396, 1401 (E.D.Va.1974), aff'd 526 F.2d 587 (4th Cir.), cert. denied, 423 U.S. 1062, 96 S.Ct. 802, 46 L.Ed.2d 654 (1975). Therefore, plaintiff has made sufficient allegations to state a claim against defendants Blue Cross and Blue Shield under Count III, and their request for dismissal of this count is denied.

IT IS THEREFORE ORDERED that all defendants' Motions to Dismiss for Lack of Capacity to Sue and Standing are denied.

IT IS FURTHER ORDERED that defendant ACR's Motion to Dismiss for Lack of Jurisdiction is hereby granted, and the Clerk is directed to cause judgment to be entered in its favor.

IT IS FURTHER ORDERED that defendant AMA's and defendant Dr. Sabatier's Motions to Dismiss for Lack of Jurisdiction and Improper Venue are denied.

IT IS FURTHER ORDERED that defendants Blue Cross and Blue Shield's Motions to Dismiss Count I for failure to State a Claim are hereby granted, and the Clerk is directed to cause judgment to be entered in their favor as to Count I. Defendants Blue Cross and Blue Shield's Motions to Dismiss Count III for Failure to State a Claim are denied.

IT IS FURTHER AND FINALLY ORDERED that defendant Pawlewski's Motion to Dismiss is denied, as is his Motion for More Definite Statement.